## William J. Bates *v.* Sallie Aven, Admx.

1. **Land.** *Purchase from State after secession. Effect on title of United States.* The purchase of, and payment for, public land, bought in April, 1861, from officers acting under an ordinance passed by the convention which had previously enacted the ordinance of secession, conferred upon the purchaser no title or right as against the United States.

2. **Dancing Rabbit Creek Treaty.** *Orphan lands. Title thereto. Adverse possession.* 
By the sixth section of the nineteenth article of the Treaty of Dancing Rabbit Creek, entered into between the United States and the Choctaw Indians (Hutchinson's Code, 125), there were reserved out of the lands ceded by the Choctaws as many quarter sections of land as there were orphan Indians in the Choctaw nation; which lands were to be selected by the United States government, and sold with the consent of the President, "and the proceeds applied to some beneficial purpose for the benefit of the said orphans." *Held*, that when the lands were selected as contemplated by this provision of the treaty the title to the whole vested in the United States, for the benefit of the orphans as a class, and no particular orphan acquired title to any particular quarter section thereof. So that the Statute of Limitations would not run in favor of one in the adverse possession of any of this land, the title being in the United States, and not in the orphans.

Appeal from the Circuit Court of Calhoun County.

Ira D. Oglesby, Esq., Special Judge, presiding by agreement of the parties, Hon. A. T. Roane being disqualified.

This appeal was taken by William J. Bates, plaintiff in the lower court, from a judgment, in favor of the defendant, Sallie Aven, administratix of the estate of Albert D. Wells, deceased, rendered upon the facts stated in the opinion of this court.

*R. H. Golladay*, for the appellant.

The land referred to is what is known as "Choctaw Orphan Lands," having its origin in the sixth clause of nineteenth ar-

ticle of treaty of Dancing Rabbit Creek. So recited in patent to Bates. Our court has had no case involving title to lands in this category. The title to reservations, provided in other articles of that treaty have arisen. *Newman* v. *Harris et al.*, 4 How. 522; *Colman* v. *Tish-ho-ma*, 4 Smed. & M. 40; *Hit-buk-ho-mi* v. *Watts*, 7 Id. 365; *Land* v. *Kiern*, 52 Miss; *McAfee* v. *Kiern*, 7 Smed. & M. 780. So on reservations in the treaty with the Chickasaws. *Wray* v. *Doe*, 10 Smed. & M. 452, 453; *Harris* v. *McKissock*, 34 Miss. 467; *Niles* v. *Anderson*, 5 How. 365; *Hardie* v. *Ho-yo-po-nubby*, 5 Cush. These cases declare that the title of the reservee is derived from the treaty, — that no patent to the reservee is necessary. But it is necessary that the steps should be taken, in accordance with the treaty, so as to ascertain the reservee, in some cases, and identify the land where not fixed by treaty. The language of the sixth clause, nineteenth article of Dancing Rabbit Creek treaty does not seem to contemplate an occupation by each orphan of a particular quarter section, or that a quarter section should be located in the name of each orphan, but that so much in gross should be reserved and sold through the President, the title in fact continuing in the United States. Perhaps no one, since *Johnson* v. *McIntosh*, 8 Wheat., supposes he can shed any light on the origin of land titles in this country. If the title be deemed to be in United States, Statutes of Limitations can have no application. Wells could not claim adverse possession while Bates occupied, as he does not claim under, or from Bates. Somewhat on this point, is *Harris* v. *McKissock*, 34 Miss. 469, 470. The register and receiver of the land office, at Jackson, did not have the authority to sell Indian orphan land till 1872. Had the authority been previously conferred on these officers at Jackson, it is believed that the ordinance of secession, adopted before the pretended sale to Wells, revoked, *per se*, the powers of these officers. *Matthews* v. *McStas* 91 U. S. 9. The right of Bates to recover in this suit rests on

*Kirkpatrick* v. *Miller*, 50 Miss. 521; *Day* v. *Britton*, 53 Id. 270.

*C. L. Bates*, on the same side.

1. The alleged purchase by decedent, A. D. Wells, on the 25th day of February, A. D. 1861, from the United States government, was absolutely null and void, and it conferred no title or equity on Wells, because the State of Mississippi was then at war with the United States government, and Wells, then being a citizen of this State, was a public enemy of the United States, was under an absolute legal disability to make said purchase. On the 9th day of January, A. D. 1861, the ordinance of secession was passed, and during the same month the secession convention authorized large amounts of money to be issued for war purposes. Journal of Convention, pp. 126–128. War was then flagrant. 2 Black, 668. The existence of war had revoked the agency of Clark, receiver, and Belle, register; and they had no power to make the sale to Wells. And the record in this case shows that the United States government repudiated the sale to Wells, and refused to recognize it by issuing a patent.

2. The Statute of Limitations cannot be interposed; because by the terms of the Dancing Rabbit Creek treaty, the title to the Choctaw Orphan Lands was vested in the United States, and the statute does not run against the government. *Nullum tempus occurrit regi*. The only stipulation contained in the treaty in regard to these lands is found in the sixth clause of the nineteenth article. See Hutchinson's Code, 125. What effect did this stipulation have on the title to the lands afterward located as "Choctaw Orphan Lands?" Did it place the title in the government? or in the Choctaw tribe? or in the orphans for whose benefit it was intended? And if in the orphans, what particular tract was vested in what particular Indian? In what particular Indian did the title to the land in controversy vest? The treaty is to be construed as a contract. *Meigs et al.* v. *McClung*, 9 Cranch, 11. Our construction is that the land was simply dedicated by the

government to raise a fund for the orphans, and that the title was by the treaty placed in the government. If not, why was the " consent of the President " necessary to a sale of the land?

*Fitz-Gerald & Whitfield*, for the appellee.

We have two grounds of defence.

1. That the title derived by appellant from Wells, evidenced by the certificate of the register of the land office to Wells of the purchase of the land, by entry at the land office at Jackson, Mississippi, and the deed of Wells to Bates, made in 1868, constituted permanent title.

2. That the land was held adversely long enough to give title by virtue of the Statute of Limitations. Either ground was of itself sufficient to render it wholly unnecessary for the appellant to pay out his money for a patent from the government. The right of a vendee to buy up an outstanding paramount title, and thus protect himself from eviction, is well settled in this State. Having so bought up the paramount title, his remedy is by action of *assumpsit* against his vendor for the recovery of the money. *Kirkpatrick* v. *Miller et al.*, 50 Miss. 521, and *Dyer* v. *Britton*, 53 Miss. 270. It is equally well settled by these cases and by the following, which were cases on the covenants of title, involving the same principle, that the title, to which the vendee yields, must be paramount. *Emerson* v. *Proprietors*, 2 Am. Dec. 34 ; *Booker* v. *Bell*, 6 Am. Dec. 641 ; *Hamilton* v. *Cutts*, 3 Am. Dec. 222 ; *Ferris* v. *Harshed*, 17 Am. Dec. 782 ; *Crance* v. *Collenbaugh*, 47 Ind. 256. In the last case the court say of the vendee, " he must, in a suit on the covenants in such deed, allege and prove such paramount title, which must be not only superior to the title under which the land was held by him, under such deed, but also superior to the title of any other person." For the appellant it is contended that the ordinance of secession revoked the authority of the register and receiver of the land office at Jackson. We do not think that the ordinance of secession had such an effect. Everything those officers did in the dis-

charge of their duties was perfectly valid and binding upon
the government until the sixteenth day of August, 1861.
*Stratham* v. *N.Y. Life Ins.Co.*, 45 Miss. 581. The date of
the certificate of the register, Bell, to Wells, 12th April, 1861,
was three days before the first proclamation of the President
of the United States closing the Mississippi ports, and seven
days before the second proclamation. The official acts of
those officers would have been good up to the 16th of August,
1861. *Matthews* v. *McStea*, 1 Otto, 7. In regard to the
second ground of defence, that appellant held possession of
the land long enough to acquire title by virtue of the Statute
of Limitations. Where a party has been in possession of
premises under his grantee a sufficient length of time to gain
title by force of the Statute of Limitations, it is complete
proof in an action against the grantor on the covenant against
incumbrances, that a recovery obtained against the grantee
by an adverse claimant was not by a paramount legal title, no
proof having been offered that the adverse claimant came
within any available exception in the Statute of Limitations.
*Sommerville's Admr.* v. *Hamilton*, 4 Wheat. 230; *Kansas
Pacific Ry. Co.* v. *Denmeyer*, 19 Kan. 53. The land in this
case was land reserved in the Dancing Rabbit treaty made on
the 28th of September, 1830, between the United States and
the Choctaw nation of Indians. Hutchinson's Mississippi
Code, sect. 19, claim 6, pp. 125, 126. This land is called
Indian orphan land, because reserved in that treaty for cer-
tain children of the Choctaw nation without father or mother.
The land belonged to the Choctaw nation before the treaty.
*Wilson* v. *Wall*, 6 Wall. 84; *Harris* v. *McKissock*, 34 Miss.
464; *Minter* v. *Shirley*, 45 Miss. 376; also *Coleman* v. *Tesh-
ho-mah*, 48 Miss. 40. Its reservation for the orphans con-
ferred title upon them. 4 How. 522; *Doe* v. *Coleman*, 4
Smed. & M. 266; *Niles* v. *Anderson*, 5 How. 383; 3 Smed.
& M. 565; *Wray* v. *Doe*, 10 Smed. & M. 452. The land
never at any time belonged to the United States government.
Before the treaty it belonged to the Choctaw nation. By

virtue of the treaty it became the property of the orphans. The treaty was made on the 28th of September, 1830. Wells' possession of the land commenced thirty-one years after that, and was continuous until he sold it to Bates, in 1868, thirty-eight years after the treaty. Bates' possession was continuous until the institution of the suit in 1882.

CHALMERS, J., delivered the opinion of the court.

By the sixth section of the nineteenth article of the treaty of Dancing Rabbit Creek, entered into between the United States government and the Choctaw Indians (Hutchinson's Code, 125), there were reserved out of the lands ceded by the Choctaws as many quarter sections of land as there were orphan Indians in the Choctaw nation, which lands were to be selected by the United States government, and sold with the consent of the President, " and the proceeds applied to some beneficial purpose for the benefit of said orphans."

The selections were made in 1830, and approved in 1837, by President Jackson. They were placed on sale first at the United States land office at Grenada in this State and afterwards in the land office at Jackson. The State Convention of 1861, which, by its ordinance of secession undertook to sever the relations between the State of Mississippi and the United States government, passed an ordinance on the 29th of March, 1861, whereby it directed that the proceeds of all sales of these lands should be paid into the State treasury, and by an ordinance of the 28th of March, 1861, continued in office the receivers and registers of the land offices theretofore acting under federal authority, and directed them to sell all public lands in this State in the name of the State, making returns of their action to the Secretary of State. Proceedings of Convention of 1861, pp. 78 and 88.

On the 5th of August, 1861, the Legislature of the State passed an act directing the issuance of patents by the Secretary of State for all public lands lying in this State which might be sold by the receivers of the several land offices.

In April, 1861, appellee's intestate, A. D. Wells, bought from the receiver and register of the land office at Jackson, the quarter section of land involved in this controversy, paying the purchase-money therefor. No patent was received therefor from the State, into whose treasury the money presumably went, and of course none was obtained from the United States government, with which the State was then at war.

In 1868, Wells sold this land to the appellant Bates, making a deed with covenants of warranty. Bates applied to the general land office at Washington City for a patent, relying upon the receiver's receipt and register's certificate issued to his vendor in 1861; but these were repudiated and a patent denied by the government, and the lands declared subject to entry and purchase. To prevent their acquisition by another, Bates again bought them from the land office at Jackson, receiving a patent therefor from the government.

He has brought this suit against the estate of his vendor to recover the money which he was compelled to expend in the acquisition of the paramount title from the government. That the title acquired by him from his vendor was a nullity, and that the title remained in the government until his second purchase, seems too plain for argument.

Manifestly his vendor acquired neither the legal title nor any equitable claim against the United States government by his purchase from and payment to those who, in 1861, had ceased to be its representatives, and had became the representatives of a hostile authority.

It is argued, however, that the present suit cannot be maintained, because at and before the time when the purchase from the government was made by the plaintiff in 1882, he and his vendor, Wells, had been in the continuous adverse possession of the land for more than ten years, that he had thereby acquired a perfect title by limitation, and was without excuse for his purchase from the government.

This argument proceeds upon the idea that by virtue of the

sixth section of the nineteenth article of the Dancing Rabbit Creek treaty the titles to the lands thereby reserved were vested in the Indian orphans, for whose benefit the reservation was made, and that against these the statute has run at least since their attainment to majority.

This view finds no countenance in the language of the section in question.

It has been frequently held by this court that the title to the lands reserved by the fourteenth article of the treaty to the heads of Indian families who elected to remain here was vested in the several reservees. Hence, against these the Statute of Limitations would run from the date of location and designation to the particular reservee.

But it is manifest that the scheme contemplated by this sixth section of the nineteenth article was wholly different. This contemplated simply a reservation in gross of a quantity of land equal to a quarter section for each orphan in the nation, which quarter sections were to be selected by the United States government, and sold out under the sanction of the President, and the proceeds held for some beneficial purpose for the welfare of the orphans. No particular orphan had any special interest in any particular quarter section, but the whole was held by the government for the benefit of the orphans as a class.

The title to the whole was vested in the government and there remained until divested by a valid sale. The Statute of Limitations, therefore, did not run, and the appellant had the right to buy in the outstanding paramount title, and to maintain this suit to recover back the money thus expended.

Judgment reversed and judgment here on the agreed statement of facts for plaintiff and appellant.