TIETJEN *et al. v.* MAYOR & ALDERMEN OF SAVANNAH.

1. The charter of the City of Savannah provides that the city may "lay such taxes on the inhabitants of said city, and those who hold taxable property within the same, . . as said corporate authorities may deem expedient for the safety, benefit, convenience, and advantage of said city, and may enforce the payment of such . . taxes in such manner as said

mayor and aldermen may prescribe." *Held,* that the power so conferred is sufficient to include authority, not only to levy ad valorem taxes upon property, but also to appoint boards of assessors to assess the value of taxable property in the city for the purposes of municipal taxation, and to contract with other persons or agencies for the purpose of aiding the tax-assessors in estimating the values of properties in the city.

2. The specific prayers of the petition in this case were to enjoin execution of a contract made by the city, of the character mentioned in the preceding division, and payment of money under its terms. The resolution in pursuance of which the contract was made purported to authorize the mayor, among other things, to enter into a contract with a named company that shall contain such agreements and stipulations as may to the mayor seem proper for carrying into effect the proposals made by the company, "as the same appears of file with said committee of council." *Held:*

(*a*) This resolution was an approval by the mayor and aldermen of the proposals filed by the company with the committee, and corporate authority to the mayor to enter into a contract with that company that would carry the proposals into effect.

(*b*) The resolution was not a delegation of legislative power to the mayor.

(*c*) The resolution was sufficient as corporate approval of the proposals of the contracting company and as corporate action authorizing the mayor to contract, and was not rendered void for indefiniteness, as contended, because it did not specifically describe the "Somers system."

(*d*) The specific relief sought being injunction to prevent the municipality from executing the contract and paying money under its terms, if the resolution was insufficient as legislative adoption of the Somers system, on account of failure to describe that system, such defect would not affect the portions of the resolution referred to above as authorizing the mayor to enter into the contract.

3. The Mayor and Aldermen of the City of Savannah may, without being said to create a debt within the meaning of article 7, section 7, paragraph 1, of the constitution of this State (Civil Code of 1910, § 6563), contract for services of persons or agencies to be rendered in aid of the board of tax-assessors of the city in assessing the value of property for the purpose of taxation, such services to be paid for out of available funds in the treasury or from the proceeds of taxes that have been or may lawfully be levied during the year in which the contract is made, although it is contemplated that the contractual compensation shall be paid in part during a succeeding year.

(*a*) The plaintiff alleged that the contract was void as creating a debt in violation of the above-mentioned provision of the constitution, because no provision was made in the tax levy for the year 1924 for the payment of the expenditure. The allegations of the petition on this subject were denied by the answer, and the evidence was insufficient to sustain the charge.

4. It does not appear that the expenditure of money under the contract would deprive residents and taxpayers of their property without due process of law, as inhibited by the due-process clause of the constitution of this State as embodied in article 1, section 1, paragraph 3. Civil Code (1910), § 6359.

5. The resolution and contract referred to in the petition, and dealt with in the second headnote and in the opinion, are not void on the ground that they violate the equal-protection or uniformity clauses of the constitution as contained in article 7, section 2, paragraph 1, of the constitution of this State.

6. The Mayor and Aldermen of the City of Savannah are vested with a broad discretion with respect to deciding whether or not they will employ the services of the agencies specified in the contract, which will not be disturbed by the courts unless plainly and manifestly abused. *Gaines* v. *Dyer*, 128 *Ga.* 585 (58 S. E. 175) ; *Commissioners of Habersham County* v. *Porter Mfg. Co.*, 103 *Ga.* 613, 617 (30 S. E. 547). The facts do not show any abuse of discretion in this case.

7. The court did not err in refusing to grant an injunction.

No. 4629. SEPTEMBER 22, 1925.

Petition for injunction. Before Judge Meldrim. Chatham superior court. November 14, 1924.

A committee appointed by the mayor of Savannah, consisting of three persons, made the following majority report to the mayor and aldermen of that city: "Your committee appointed by the mayor for the purpose of devising ways and means for raising additional revenue for the advertising fund, as well as other necessary improvements for 1925, with instructions to consider the equalization of property values for reassessment purposes, begs to say they have studied the Somers system, and wish to make a majority favorable report, and recommend adoption by council of this system of equalization of property values." The report of the committee was accepted and adopted by resolution of council, October 15, 1924, as follows:

"Resolved by the Mayor and Aldermen of the City of Savannah in council assembled, that the report of the special committee of council charged with the duty of investigating the desirability of adopting the Somers system of realty valuation, to be used in connection with the tax-assessors in the equalization of the assessment values of real estate in and for the City of Savannah, be and the same is hereby approved and adopted, and the mayor of the city is hereby authorized and instructed to enter into a contract with the Manufacturers' Appraisal Company of Philadelphia, Penn., operators of the Somers system of realty valuations, in the name of the Mayor and Aldermen of the City of Savannah, putting the said system in immediate operation in the City of Savannah, and that said contract shall contain such agreements and stipulations as may to the mayor seem proper, carrying into effect the proposals

made by said Manufacturers' Appraisal Company, as the same appears of file with said committee of council."

On October 17, 1924, the mayor mailed to the Manufacturers' Appraisal Company a proposed contract signed by the mayor, the material portions of which were alleged in the bill of exceptions to be as follows:

"The Company to furnish the City the following services by way of assistance to the Board of Tax Assessors of the City in the method of valuation for taxation purposes of all land sites and buildings within the City of Savannah, as follows: 1. LAND. The services of experts in land valuation methods, who will assist the Board of Tax Assessors of the City in the ascertainment of the valuation, under the statutory provisions of law, of each single street or highway to the land sites fronting thereon, within the City. The Assessors having finally determined such valuations in terms of unit-foot price, the experts to be furnished by said The Manufacturers' Appraisal Company will compute the valuations of all land sites, accurately and proportionately and truly, in consideration of unit-foot valuation, sizes and shapes of sites, and the relations of such sites to the various elements of assessibility and usefulness which contribute value to such land sites. 2. BUILD-INGS AND IMPROVEMENTS. The Company agrees to furnish the services of experts in building valuation methods, who, with competent assistants, will, by way of assistance to the Assessors, measure and describe all buildings and improvements upon all lots and parcels of land in the city, applying factors of valuation and depreciation for each, based upon the fair market cost of new production, with specific depreciation, if any, expressed in one percentage, for consideration of mechanical deterioration, obsolescence, age, and lack of utility; complete information and data showing for each building or improvement the size, the class and kind, condition, number of stories, roof, etc., together with improvements, such as fixtures, water, bath, sewer and electric connections; with factors of valuation and depreciation, as ascertained by local investigation, and approved by the Assessors. 3. PUBLIC AND STATE PROPERTY, ETC. The said Company agrees that this service shall apply to the valuation of all the real property, land and buildings within the City, with the exception of railroad and telegraph, telephone, sleeping-car and express company property; and that it

shall include all property owned by the municipality, county, state, and national government, as well as churches and hospitals and other exempt properties in said city. 4. CITY MAPS. The Company agrees to furnish one negative and three blue-line prints of sectional maps of the City drawn to scale 100 feet to 1 inch, showing unit-foot valuation for all streets in the city; lot and block numbers; the indication on such map by symbol of the location of all buildings within the corporate limits of the city, and the necessary maps to be used at public meetings for discussion of street unit-foot valuations. 5. GENERAL. The Company agrees to inclose in substantial paper envelopes, properly designated as to block numbers and parcel numbers, the land computation records, with valuations, and the building record cards for all lots or parcels within the city; the Company agrees that its experts in methods of land valuation will instruct the Board of Tax Assessors of the City in the present and future use of the methods of valuation and computation, so that the System installed may be continued and kept up to date. The City will furnish the Company or its representatives a suitable place to hold the necessary public meetings, and for its employees to work; also will furnish the use of existing records of the city, so far as they may be useful. The Company agrees to furnish labor, material, and equipment of every kind to complete the service, and upon completion of work will furnish City with enough additional land and building cards to record estimated changes in assessment valuations for a period of three years. All of said work to be done without any increase upon the part of the City of the present force of the Board of Tax Assessors' office. The Company agrees to complete entire work on or before five months after signing this agreement, subject to the satisfaction of and acceptance by city authorities. The City is to pay $25,000 in installments as follows, expressly subject, however, to the provisions of the next succeeding paragraph: $1,500 on November 15, 1924, $2,187.50 as follows: Nov. 30, Dec. 15, Dec. 31, 1924; January 15, 31, February 15, 28, March 15, 1925; and $6,000 March 31, 1925; final payment to be made upon satisfactory fulfillment of services. The City has right to discontinue services under agreement without assigning reason therefor at any time, and upon payment of amount due under schedule of payments on account, upon written notice of one week to president of Company

9

at 18 S. 7th St., Philadelphia. Company firmly bound by obligations of this agreement, except that it may discontinue the services in event that payments on account shall not be made as stipulated."

On October 18, 1924, John F. Tietjen Jr. and others, as residents and taxpayers, instituted an action against the mayor and aldermen to enjoin the making of the proposed contract, and payment of money thereunder. The petition as amended alleged that it was not within the charter power of the municipality to make such contract, and that for various reasons it was illegal. The defendants' answer alleged that the contract had been entered into prior to the filing of the petition, that it was lawful and within the power of the city, and that the defendant should be permitted to carry out its terms. At an interlocutory hearing the judge refused a temporary injunction, and the plaintiffs excepted.

*George H. Richter,* for plaintiffs.

*F. P. McIntire* and *Thomas F. Walsh,* for defendants.

ATKINSON, J. 1. The express charter powers of the Mayor and Aldermen of the City of Savannah include authority to "lay such taxes on the inhabitants of said city, and those who hold taxable property within the same, . . as said corporate authorities may deem expedient for the safety, benefit, convenience, and advantage of said city, and may enforce the payment of such . . taxes in such manner as said mayor and aldermen may prescribe." Code of 1863, § 4756; Code of Savannah (1907), § 40. The power to "lay" and "enforce the payment" of taxes as provided in the foregoing excerpt, "in such manner as said mayor and aldermen may prescribe," is sufficient to include authority, not only to levy ad valorem taxes upon property, but also to appoint boards of assessors to assess the value of taxable property in the city for the purposes of municipal taxation, and to contract with other persons or agencies for the purpose of aiding the tax-assessors in estimating the values of properties in the city. The foregoing power was not taken away by subsequent enactment (Acts 1890-1, p. 231) now contained in the Civil Code (1910), § 862, providing that: "The mayor and council of each town or city are authorized, at their option, to elect three freeholders, residing in the town or city, as assessors, who shall value and assess all the property within said town or city liable for taxation. All persons dissatisfied with the value placed on their property shall appear before said asses-

sors and produce testimony as to the value of property, and the decision of said assessors, after hearing the evidence, shall be final: Provided, that this section shall not affect towns or cities now having the power to appoint assessors." Nor was such power taken away by the act of 1909 (Acts 1909, p. 72, Civil Code (1910), § 1003), providing that: "In returning property for taxes, all property shall be returned at its value. Promissory notes, accounts, judgments, mortgages, liens of all kinds, and all choses in action shall be given in at their value, whether solvent or partially solvent." Nor by the act of 1909, p. 75 (Acts 1909, now contained in the Civil Code (1910), § 1004), providing that: "The intent and purpose of the tax laws of this State is to have all property and subjects of taxation assessed at the value which would be realized therefrom by cash sale, as such property and subjects are usually sold, but not by forced sale thereof, and the words 'fair market value,' when used in the tax laws, shall be held and deemed to mean what the property and subjects would bring at cash sale when sold in such manner as such property and subjects are usually sold." The provision of the act of 1909, as now contained in the Civil Code, § 1004, defining the terms "fair market value," as employed in the tax value, merely states a rule to be applied by municipalities in arriving at the value at which taxable property shall be assessed for the purposes of taxation, and does not purport to limit investigations or the manner or agencies by which the municipal authorities shall inquire into such values of taxable property. When properly construed, the proposed contract set out in the statement of facts, which it was sought to enjoin, was a contract of employment of an agency to make investigations as to the value of taxable property, as an aid to the tax-assessors in making the assessment as to values of property for taxation as prescribed in the statute. Civil Code, § 1004. No recommendation or report by the agency is made conclusive and binding upon the municipality or any property owner. It follows therefore that the contract was not void on the ground, as contended, that the Mayor and Aldermen of the City of Savannah were not authorized by the city charter to make it.

This ruling does not contravene the decision of this court in the case of *Decatur County* v. *Roberts,* 159 *Ga.* 528 (126 S. E. 460), holding in effect that the provision of the statute (Acts 1904, p.

252), which declared "That said board shall have power to assess, levy, and collect such taxes as may be necessary to defray the current expenses and build and repair the public property of the said county," did not imply power for the commissioners to employ an agent to do specified work which the board of tax assessors were expressly authorized by statute to employ an agent to perform; that such express statutory power existing in the board of tax-assessors of the county to perform negatived any implied authority of the board of county commissioners to do the same thing.

2.   The ruling announced in the second headnote does not require elaboration.

3.   The contract specified certain services that the company should render to the city in aid of the board of tax-assessors, and further provided as follows: "The City is to pay $25,000 in installments as follows, expressly subject, however, to the provisions of the next succeeding paragraph: [then follows a schedule of payments and their maturities, the first payment falling due November 15, 1924, and the last March 31, 1925], final payment to be made upon satisfactory fulfillment of services. [Then follows the above-mentioned *next succeeding paragraph*] The City has [the] right to discontinue services under agreement without assigning reason therefor at any time, and upon payment of amount due under schedule of payments on account, upon written notice of one week to president of Company at 18 S. 7th St., Philadelphia. Company firmly bound by obligations of this agreement, except that it may discontinue the services in event that payments on account shall not be made as stipulated." Paragraph 9 of the petition alleges that the contract requires payment by the city of $25,000. Paragraph 11 alleges: "No provision was made in the tax levy for the year 1924 for any such expenditure." Paragraph 15 alleges: "The city has a floating debt of $340,000, representing the excess of disbursements over receipts for several years past." These allegations were denied. Paragraph 13 of the petition alleges: "The city now owes $60,000 for money borrowed during the year 1924." This was admitted in the answer; but paragraph 14 of the petition, alleging that the "money was borrowed to pay current expenses, although expressed to be for casual deficiencies in revenue," was denied. There was no evidence to prove those allegations of the petition above mentioned, which were denied by

the answer. An amendment to the petition alleged: "20. The assessed value of real estate in said city (exclusive of real estate of public-service corporations) is $48,000,000. The assessed value of personalty (exclusive of public-service corporations) in said city is $15,500,000. The value of public-service corporation property is $10,500,000, of which $3,800,000 is real estate, $5,500,000 is personalty, and $1,200,000 is franchise. 21. It is the purpose of the city to raise additional revenue for the year 1925, partly in the sum of $100,000 to appropriate for advertising fund, and partly for other purposes. 22. The contract proposed to be made by the city excepts the real estate and property of public-service corporations from the operation of the Somers system." There was evidence to prove these allegations. The city introduced in evidence "a statement showing the anticipated revenue for the year 1924, as established by its budget ordinance adopted December 26, 1923, to be the sum of $1,900,000. Said statement also showed the disbursements to September 30, 1924, and the anticipated disbursements to December 31, 1924, aggregating the sum of $1,842,334.27, leaving an unexpended balance of $57,665.73. Said statement also showed the actual cash receipts to September 30, 1924, and the estimated cash receipts for the remaining three months of 1924, aggregating a total of $1,964,216.88, or an excess of cash to be collected over income estimated of $64,216.88." The defendant also introduced in evidence its ordinance appropriating for the year 1924 the sum of $234,800 for improvements to be made during the year, and a statement from its comptroller showing that there was an unexpended and unappropriated balance of $48,000 to the credit of this item.

It was held in *Manly Building Co.* v. *Newton,* 114 *Ga.* 245 (40 S. E. 274): "County authorities may, without being said to create a debt within the meaning of the constitution, contract for the building of a court-house to be paid for out of available funds in the treasury, or with the proceeds of taxes that have been or may lawfully be levied during the year in which the contract is made." See also *Carruth* v. *Wagener,* 114 *Ga.* 740 (40 S. E. 700); *Gaines* v. *Dyer,* 128 *Ga.* 585 (7) (58 S. E. 175); *Spalding County* v. *Chamberlin,* 130 *Ga.* 649 (3) (61 S. E. 533); *Hogan* v. *State,* 133 *Ga.* 875 (3) (67 S. E. 268); *Monk* v. *Moultrie,* 145 *Ga.* 843 (90 S. E. 71); *City Council of Augusta* v. *Thomas,* 159 *Ga.* 435 (3)

(126 S. E. 144). It was held in *Gaines* v. *Dyer,* supra: "A contract between the county authorities and another person for the construction of a public bridge for which there is a present necessity, entered into after the levy of a special tax sufficient to pay for the bridge, and during the same year, does not create a debt, although it is contemplated that the contract price shall be paid in whole or in part during a succeeding year." Upon application of the principles announced above, the evidence does not show that the agreement to pay $25,000, as embodied in the contract in this case, was the creation of a new debt within the meaning of article 7, section 7, paragraph 1, of the constitution of this State (Civil Code of 1910, § 6563), inhibiting municipalities from creating new debts without submitting the question to the qualified voters of the municipality.

4. The ruling announced in the fourth headnote does not require elaboration.

5. In an amendment to the petition it was alleged: "23. It is the purpose and intent of the city, in having the Somers system applied to realty valuations, to have such real estate (except that owned by public-service corporations) bear the entire cost of such increase in revenue, by having such real estate assessed in an increased sum, rather than adopt the alternative of an increase in the rate of taxation. 24. The resolution set out in the original petition, and the contract to be made pursuant thereto, are unlawful and contrary to par. 1, sec. 2, art. 7 of the constitution of said State [Civil Code (1910), § 6553], in that it will not operate uniformly upon the same class of subjects, viz., real estate, in that the real estate of public-service corporations will be exempt from the operations of said resolution and contract. 25. Said resolution and the proposed contract are unlawful and void, in that they unfairly discriminate against persons other than public-service corporations in the assessment of their real estate, and in favor of such public-service corporations. 26. Said resolution and the proposed contract are unlawful and void, in that they are not general in their operation, but exclude the real estate of public-service corporations from their operation." A witness testified: "I am president of Manufacturers' Appraisal Company. In brief, the Somers system of valuation is the application of science to the valuation of real estate; the result is for the tax-assessors, who may

adopt the figures or not, as they see fit. There is a deficiency in the method of 'fair value' prescribed by the State. The service we are to perform is contained in the proposed contract which has been offered in evidence, and that also includes the information we are to furnish the tax-assessors. We fix a unit-foot valuation of property, valuing the land and buildings separately; the figure thus fixed by us is submitted to the tax-assessors, a public meeting is then held, participated in by us, the tax-assessors, and the public; a figure is agreed upon at this meeting as representing the unit-foot value, and this figure is applied, with variations to suit the individual pieces of property. This unit-foot value is first applied to the business center; and having been thus appraised, a basis exists for valuing in similar manner the adjacent districts. Cross-examination: The effect generally in cities where we have inaugurated the plan is that the assessment of realty has been increased, some property being assessed at less and some at more than under the system in vogue. If there be a deficiency in the State rule of 'fair value' and this rule should be applied by the comptroller-general in the assessment of realty of public-service corporations, and the Somers system applied to the other realty, the latter would be discriminated against in that it would carry a higher assessment."

As stated in the second headnote, the resolution therein referred to was not a delegation of legislative power, but was merely the expression of authority to the mayor to enter into the contract for employment of agencies to render specified services. The contract made in pursuance of the resolution does not purport to bind the municipal authorities to accept or adopt any recommendations or estimates that might be made by the persons or agencies employed to aid the assessors. The results of the services to be rendered by the company are, at most, information furnished to the city on the subject of valuation of property of certain classes of persons. The information may or may not be helpful, and may or may not be accepted and acted upon by the municipal authorities. In these circumstances the contract of the city engaging such services does not impose any liability or fix any valuation upon the property of public-service corporations or upon the property of other persons, and consequently does not impose unequal burdens upon the property of such classes of taxpayers, and does not offend the uniformity

or equal-protection clauses of the above-mentioned provision of the constitution.

6, 7. The rulings announced in the sixth and seventh head-notes do not require elaboration.

*Judgment affirmed. All the Justices concur.*