ALEXANDER, et al. *v.* MAYOR and BD. OF ALDERMEN OF CITY OF NATCHEZ, et al.

Dec. 7, 1953

No. 38999 45 Adv. S. 1 68 So. 2d 434

*Chas. F. Engle, R. L. Netterville,* Natchez, for appellants.

*Brandon, Brandon, Hornsby & Handy; Laub, Adams, Forman & Truly,* Natchez, for appellees.

REPLY TO THE BRIEF OF APPELLANT.

Ethridge, J.

This is a taxpayer's suit against the Mayor and Board of Aldermen of the City of Natchez, Mississippi, attacking the validity of a contract between the city and a firm of expert property appraisers. No proof was taken, the decrees in the chancery court being on special and general demurrers. ██ ██ For purposes of this decision on the demurrers, we assume the facts properly pleaded in the bill of complaint to be true.

Several amendments to the original bill of complaint were filed by appellants, Alma Alexander, et al., taxpayers in the City of Natchez and complainants below, but

since the decrees appealed from have reference to the final "amendment to amended bill of complaint," we will refer to that pleading as the bill of complaint. Appellants complied with the requirement of such bills that they invite all other taxpayers to join in the suit. The defendants below and appellees and cross-appellants here are the present Mayor and Board of Aldermen of the City of Natchez, and others who were such officers of the city at the time the contract hereinafter referred to was executed, and John D. Cole, Harold F. Layer, and Melvin J. Trumble of Dayton, Ohio, doing business as Cole-Layer-Trumble Company, a partnership (hereinafter referred to as company.) On February 16, 1950, the City of Natchez entered into a contract with Cole-Layer-Trumble Company. A photostatic copy of that contract was attached as an exhibit to the bill. The contract was executed for the City of Natchez by its Mayor and City Clerk, approved by the city attorney, and by the company. Prior thereto and on January 10, 1950, the Mayor and Board of Aldermen unanimously adopted a resolution and order authorizing the Mayor to execute with the Cole-Layer-Trumble Company a contract for professional services by the latter in making a detailed appraisal and valuation study of all properties in the city, upon the company filing bond with the City Clerk "to be approved as to form by the city solicitor . . . and as to security by the city clerk" in the amount of $51,250, "for a term of two years conditioned to faithfully perform said articles of agreement." This resolution recited and the exhibit reflects that a copy of this contract with the company was attached to the resolution.

The contract manifestly was attempted to be executed under the provisions of Code 1942, Section 3736. This statute was first passed in Mississippi Laws of 1938, Extraordinary Session, Chapter 19, as part of the Municipal Home Exemption Act of 1938. Section 3736 was

repealed by Mississippi Laws of 1950, Chapter 492, Section 45, which is Code Section 3742-45, which went into effect on July 1, 1950, and on that date Section 3736 was superseded by Mississippi Laws 1950, Chapter 492, Section 30, which is Code Section 3742-30. That latter statute is still in effect and is practically the same as the old act. Section 3736, in effect at the time the instant contract was executed, provided:

"Surveys and appraisals authorized.—The governing authority of any municipality in this State is hereby authorized, in its discretion, to have the lands in the municipality (whether platted in lots and blocks or otherwise described) appraised, surveyed, the area determined, and the land and any buildings, structures or improvements thereon valued for the purpose of assessment and taxation. Such survey and appraisal may be made by the assessor or by a competent person, or persons, to be selected by the authority, and the cost thereof paid from the general fund. When such survey and appraisal is made, a permanent record thereof shall be prepared and preserved as a public record by the clerk; and the assessor, any member of the governing authority or any State official performing duties with reference to the assessment of property shall have access to such records at all reasonable hours.

"The governing authority may have prepared cards, maps, plats and such other records as may be considered proper and necessary to keep a record of all land and the elements of value thereof, in the municipality, and to revise and correct the same, from time to time, in order that such appraisal, and the other information, may be current."

The contract executed in pursuance of the resolution of the Mayor and Board of Aldermen of Natchez consists of six typewritten pages with a detailed outline of the duties of Cole-Layer-Trumble Company. The contract first provided: ". . . it is hereby agreed that the

Cole-Layer-Trumble Company shall cause to be made property maps and an appraisal and revaluation of the following items, to-wit:

"A. Mapping, plotting, and indexing of all properties within the present city limits of Natchez, Mississippi.

"B. Appraisal of all taxable real property, Residential, Commercial and Industrial situated within the present city limits of Natchez, Mississippi.

"C. Appraisal of Furniture and Fixtures in Commercial Establishments and Machinery and Equipment in the Industrial Plants located in the present city limits of Natchez, Mississippi."

Paragraph 1 of the contract then stated:

"*Direction of Mapping and Revaluation Program.* It is specifically agreed that in the mapping, reappraisal and revaluation, for assessment purposes, of the properties covered by this contract, the Assessor of the City is to act and serve as Appraiser in Chief. All final decisions as to final assessed valuations, procedures followed, and forms used in the revaluation work shall be made by the Assessor."

The agreement then contained additional detailed paragraphs numbered 2 through 13. Paragraph 2 provided for a "mapping program" to be followed. The company would provide the services of experienced and competent engineers, draftsmen and surveyors. It would furnish new aerial photographs of the city, prepare new tax maps showing all lots and tracts with dimensions and ownership, set up a card index system based on a geographical and alphabetical filing card system of all properties in the city, tying it in with existing tax records, furnish stenographers and clerical assistants, and prepare a new city map. Under paragraph 3 the company would make a careful investigation of current industrial, commercial and residential construction costs in the city, including prices of materials and wage schedules, and after analyzing these data it would develop unit costs to include these

and all other relevant factors, and would test these unit prices for accuracy against buildings of known costs in the city.

Paragraph 4, providing for the valuation of residential property, stated: "Each building will be accurately measured, inspected, classified, and listed on an appraisal record card supplied by the Company. These record cards will include an outline dimension sketch of each residence with its physical description indicated. Replacement, physical, and sound values of each residence will be shown. Land values will be computed on the basis of frontage and depth from unit front foot values established by the Company and approved by a committee of local authorities. Upon completion of the proposed work all of these record cards, together with schedules used in the appraisal, will be turned over to the Assessor of the City for use in preparing the tax roll."

Paragraphs 5, 6, 7, and 8 had somewhat similar detailed statements of what the company would do in the valuation, respectively, of commercial property, industrial property, machinery and equipment in industrial plants, and furniture, fixtures and equipment of commercial establishments. Paragraphs 9-12 provided that the company would have made available to it all tax records, deeds and other records pertaining to city property; that the city would furnish the company office space for the survey; that the company would complete its reports within ten months from the execution of the contract; that the company would make available to the city in its equalization of property values the services of its chief appraiser and the services of its qualified representatives to support any revaluations in litigation in the courts within one year from the completion of the appraisal, without additional cost to the city. In consideration of these services the city agreed to pay the company $51,250, in monthly payments based upon ninety percent of the estimated proportion of the work

completed during each month, with the balance of ten percent to be paid upon completion and delivery of the finished reports by the company.

The bill of complaint assailed the validity of the contract with the company in numerous details, but essentially its basis of attack was on two grounds: First, it was charged that the contract was not authorized by law and was void because it provided a method of valuation in violation of Mississippi Constitution, Section 112, and statutes and Second, it was averred that the contract was void because of several procedural defects in the manner and method of its execution. For those reasons the complainants asked for a decree declaring the contract void and unenforceable, and adjudging that all money paid to the company under the contract should be returned to the city; for a judgment against the company for the amounts so paid; and in the alternative a judgment against the members of the board of aldermen and the mayor who made the contract and approved the payments, on the condition that the city cannot recover from the company. The bill further asked that the city be enjoined from making further payments under the contract and from paying any money to attorneys defending this suit for the city. To that bill Cole-Layer-Trumble Company filed a special demurrer and a general demurrer, and the other defendants, the mayor and board of aldermen, et al., also filed similar special and general demurrers.

The chancery court overruled both general demurrers. It sustained those parts of the two special demurrers which demurred to the parts of the bill of complaint which charged that the city had no authority to execute such a contract, and which attacked the manner and method of the work done by the company subsequent to the execution of the contract. The court overruled those parts of the special demurrers which specially demurred to the alleged procedural defects in the contract pre-

cedent to its execution. All four of these decrees allowed interlocutory appeals to settle the controlling legal principles, and allowed the aggrieved parties to amend within thirty days from the date this Court takes final action in the case. From the decrees sustaining in part the special demurrers, the appellants Alma Alexander, et al., have taken a direct appeal, complaining of the action. The defendants have taken a cross-appeal complaining of the overruling of their general demurrers and of parts of their special demurrers. In this opinion we will consider the basic issues raised by the pleadings. We have concluded that the trial court should have sustained the general demurrers of appellees and cross-appellants, defendants below.

Appellants assert that the contract with Cole-Layer-Trumble Company is without authority of law, and violates the Constitution and statutes. We find no merit in this contention. Code Section 3736, quoted above, expressly authorizes any municipality to select ''a competent person or persons'' to appraise and survey lands, buildings, structures or improvements thereon, and to value the same for the purposes of assessment and taxation. This act further details some of the basic authorized steps and purposes of such a survey and appraisal. The City of Natchez was expressly authorized to execute this contract under Section 3736.

Nor do we see any conflict with Mississippi Constitution of 1890, Section 112, which provides that taxation shall be uniform and equal throughout the State; and that property ''shall be taxed in proportion to its value,'' ''according to its true value,'' and ''assessed at its true value.'' This provision is amply complied with in the contract, the obvious purpose of which is to obtain a realistic and up-to-date valuation of properties in the city in the light of established economic facts. The contract expressly provides that replacement, physical and sound values of the properties will be shown, and

that building costs and other relevant factors will be used in such computations. Code Section 9759 provides for a general method of valuation of property, its cash value at the time, "and not what it might sell for at a forced sale, but what he would be willing and would expect to accept for it if he were disposed to sell it." Code Section 9769 states the same theoretical test, making the basic criterion "its true value" and taking into consideration certain stated items "and any other circumstances that tend to enhance its value." In McArdle's Estate v. City of Jackson, 215 Miss. 571, 61 So. 2d 400 (1952), these statutes were considered and the Court said:

"All of the facts as to the condition of the property, its surroundings, its improvements, and capabilities may be considered. Miss. State Highway Commission v. Hillman, 1940, 189 Miss. 850, 198 So. 565; Knox, Attorney General, v. Southern Paper Co., 1926, 143 Miss. 870, 108 So. 288. Moreover, appellant's instruction Number 7 correctly told the jury 'that you may consider the then use of said property and the net income received from said property after payment of taxes and expenses as some evidence of its true value or market value * * *' . . . While income or rental value of real property is one proper element for consideration in determining its value, this factor is not the sole criterion, and all other relevant facts should be considered in determining valuation. 51 Am. Jur., Taxation, Sec. 705; Anno., 95 A. L. R. 434. Hence whether the property is devoted to the uses for which it is best adapted, and is in a condition to produce its maximum income, is a legitimate inquiry. Actual income may not be so important in determining true value as is earning capacity. The jury could consider appellee's evidence that the property was not put to its best economic use. . . . The intricate details of proper valuation of property and specialized knowledge as to geographic, economic and social facts and

their significance to value has warranted the courts in recognizing the use of expert testimony for valuation of real property, for consideration by the jury along with all of the evidence in the case.''

Hence the established and realistic interpretation of Constitution Section 112 and the cited statutes have been recognized to be in accordance with the quoted principles and the apparent purposes of the contract here in issue. Appellants attack upon the constitutional issue is based primarily upon Hawkins v. Mangum, 78 Miss. 97, 28 So. 872 (1900). But the artificial criteria established by the statute which was struck down in that case are entirely different from the bases of the present contract.

Appellants argue that the following sentence in the contract shows that the basis of valuation is not to be in accord with the constitutional ''true value'' test: ''Land values will be computed on the basis of frontage and depth from unit front foot values established by the Company and approved by a committee of local authorities.'' To use front foot and depth values as a measuring stick for computation is entirely different from the necessary precedent step of ascertaining what the elements of those values will be. ■■■ The contract expressly provides that the method of ascertaining value will be by considering the sound value of the property, including its replacement, physical and other values. This procedure is in accord with the judicial interpretations of Mississippi Constitution, Section 112, and the cited statutes. ■■■ Nor is there any merit in the charge that the contract unlawfully delegates the powers of the city assessor to a private organization. The contract expressly provides that ''All final decisions as to final assessed valuations, procedures followed, and forms used in revaluation work shall be made by the assessor'' of the city. The function of Cole-Layer-Trumble Company was to assist the city assessor in getting the facts upon which the latter could base his final valuation. The same response on similar

contracts to the argument on unlawful delegation was made in Stocklan v. Brackett, 95 N. H. 227, 61 A. 2d 140 (1948) ; Conroy v. City of Battle Creek, 314 Mich. 210, 22 N. W. 2d 275 (1946) ; Hutchins v. Chandler, 209 Ga. 415, 73 S. E. 2d 141 (1952). These three cases involved somewhat similar contracts by the same appraising firm as that in this case. Although in these cases there was no statute similar to Section 3736, the courts in each of them implied a power to execute a similar contract. See also Tietjen v. Mayor and Aldermen of Savannah, 161 Ga. 125, 129 S. E. 652 (1925).

The bill of complaint further charged that the valuations made by the city assessor under this contract are in fact discriminatory and not equal and uniform, and are arbitrary in amounts. An exhibit attached to the bill itemized several comparative assessments of certain properties in the city to support this charge. However, if appellants were aggrieved as to the assessments affecting their property interests, they should have filed objections with the Mayor and Board of Aldermen and have taken appeals from such assessments in the manner provided by statute. Miss. Code 1942, Sections 3716-3721, amended in 1950 by Code Sections 3742-12 through 3742-17, and Code Section 1196 deal with appeals from general ad valorem tax assessments. On special assessments, see Code Section 3678, amended in 1950 by Section 3664-06; Code Section 1196.

The bill charged that the resolution of the mayor and board was adopted on January 10, 1950, "with respect to a contract dated the 16th day of February 1949 . . . ." A photostatic copy of the contract was attached as an exhibit to the complaint. Its first line dates the contract February 16, 1949, the year having been typed in, the remainder of the date having been written in longhand. Appellants charged that since the contract is "dated" February 16, 1949, and since the resolution authorizing its execution was executed January 10, 1950, the contract,

having been entered into prior to its authorization, was void. However, we think that the instruments on their face show that the contract was not entered into until after it was authorized on January 10, 1950. The resolution refers to the contract, which is attached to it, and authorizes its execution *after* the company has filed a performance bond with the city clerk. The upper right-hand corner of the contract as filed shows the notation "Agreements 1950," which is apparently a filing notation of the city clerk. The bill expressly charges that the contract is "on file in the office of the city clerk." Moreover, the performance bond of the company recites that the contract was executed "on or about February ......, 1950." The bond itself was executed February 16, 1950, and approved by the city solicitor as to form on February 21, 1950. This approval as to form and the giving of the bond were both required by the resolution of January 10, 1950. Moreover, the bill of complaint does not charge specifically as a fact that the contract was executed on February 16, 1949. It simply charges that the contract was "dated" as of that date. And the photostatic copies of the instruments attached as exhibits control where there is any divergence from the averments of fact in the bill. Taking all of these instruments together, it is manifest that the insertion of the year 1949 in the first line of the contract was an inadvertence, and that all of these documents support the conclusion of fact that the contract was executed in 1950 after the resolution authorized it.

The bill further averred that the performance bond of the company was never approved by the city clerk, in that the clerk did not endorse on it any approval, and the minutes of the mayor and board do not reflect the special approval indicated in the resolution, which required the city clerk to approve the bond "as to security." The resolution does not require that the clerk endorse on the bond his approval. The bill avers that the bond is filed

in the city clerk's office. The city clerk executed the contract along with the mayor. ██ We think that his acceptance of the bond by filing it in his office, followed by his subsequent execution of the contract, necessarily constituted an acceptance by him of the bond. Moreover, there is no charge that the bond itself in invalid. In fact, appellants seek to recover on the bond. Small v. Sturgis Lumber Co., 216 Miss. 515, 62 So. 2d 765 (1953). Moreover, 8 Am. Jur., Bonds, Section 25, p. 717, states this additional reason for that view: ██ ''The failure of a court or officer to approve or file an official bond will not affect its validity for the reason that the government or other official body is not responsible for the laches of its officers.''

It is further argued that the contract was void because it was entered into without advertising for competitive bids. Appellants rely on an 1899 city ordinance, which provides: ''that all work to be done for the city, to cost over twenty dollars, must be done by contract, and let to the lowest and best bidder.'' The statute upon which this contract is based does not require competitive bidding, and in fact provides that the survey and appraisal may be made by a person ''to be selected by the authority . . . '' No other state statute requires competitive bidding on a contract of this sort involving highly professional services. ██ We do not think that the word ''work'' as used in the Natchez ordinance applies to professional services requiring special training and skill of the type contemplated by this contract. Annotation, 44 A. L. R. 1150 (1926) ; 92 A. L. R. 835, 837 (1934) ; 142 A. L. R. 542 (1943). Continental Life Ins. Co. v. Turnbough, 151 Miss. 43, 117 So. 334 (1928), is not pertinent because it deals with a different subject matter.

Appellants further charged in the bill that the mayor and board of aldermen violated the provisions of Code Section 3650, which provides: ''All expenditures of money, for any purpose whatever, shall be in pursuance

of a specific appropriation made by order, and in no other manner." It was averred that complainants "have found no specific appropriation on the minutes of the mayor and aldermen . . . making a specific appropriation of the amount of the contract price." However, the execution of the contract was not an expenditure of money and called for no money to be paid at the time of its execution. Stocklan v. Brackett, supra; Conroy v. City of Battle Creek, supra. Any appropriation of money under the contract would be made by a later act of the board. The bill does not specifically charge that the installment payments later made were paid without an order. In fact, in seeking to recover the money already paid, the bill avers that "aldermen voting for the paying out of money . . . should be held personally liable."

Code Section 4321 provides: "No warrant shall be issued or indebtedness incurred by any county or municipality unless there is sufficient money in the particular fund from which the allowance is or must be made, to pay such warrant or indebtedness. . . ."

Complainants aver that "an examination of the records of the City of Natchez does not disclose that there was available and on hand the amount of money necessary to liquidate the indebtedness incurred in said alleged contract," and that therefore the contract was void. Exhibits to the original bill reflect payments to the company totaling $35,000 in two checks, and those checks reflect that they were charged to the "general funds" of the city. The fact that those checks were paid from that fund is evidence that there was sufficient money to pay it. Moreover, the bill itself recognizes that said payments were actually made to the company under the contract. Hence the bill and the exhibits reflect that in effect Code Section 4321 was complied with. Moreover, the bill does not charge as a fact that there were not sufficient funds to pay the installments, but simply charges that the records of the city do not disclose that there was available when

the contract was executed the necessary amount of money. Hence we find no merit in this contention, and therefore it is unnecessary for us to consider whether Section 4321 is applicable both to special funds and the general fund of the city. ▮▮ Furthermore, this contract for future services did not constitute at the time of its excution the incurring of an indebtedness. Stocklan v. Brackett, supra; Conroy v. City of Battle Creek, supra.

We find no merit in any of the other allegations of the bill of complaint on the general demurrers. We conclude that the chancery court should have sustained the two general demurrers filed by appellees and cross-appellants, and on the cross-appeals we reverse those decrees and remand the case. ▮▮ Where a general demurrer is sustained, special demurrers should be disregarded, for it then becomes useless to pass upon them. The trial court should have sustained the general demurrers and have disregarded the special demurrers. Marquette Cement Mfg. Company v. Fidelity & Deposit Company of Maryland, 173 Miss. 164, 178, 158 So. 924 (1935). Hence consideration here of the special demurrers is not necessary. For these reasons, all of the costs will be taxed against the direct appellants, complainants below.

Reversed and remanded on both direct and cross-appeals.

*McGehee, C. J.,* and *Kyle, Arrington* and *Lotterhos, JJ.,* concur.