491 So.2d 508 (1986)
CINQUE BAMBINI PARTNERSHIP, Carroll W. Allen, Lydia Carroll, Hamilton Petroleum Company, and Enserch Exploration, Inc. and Phillips Petroleum Company
v.
STATE of Mississippi and Saga Petroleum U.S., Inc.
No. 55306.
Supreme Court of Mississippi.
May 14, 1986.
As Modified on Denial of Rehearing July 30, 1986.
*510 Ernest G. Taylor, Neil P. Olack-Watkins, Ludlum & Stennis, Jackson, William C.W. Haynes, Houston, Tex., L. Arnold Pyle  Pyle, Harris, Dreher & Mills, Jackson, Walter James Phillips  Gex, Gex & Phillips, Bay St. Louis, Newt P. Harrison, John Edward Milner  Brunini, Grantham, Grower & Hewes, Jackson, William Joel Blass  Mize, Thompson & Blass, Gulfport, for appellants.
Edwin Lloyd Pittman, Atty. Gen. by Mack Cameron, Sp. Asst. Atty. Gen., Charles Edward Harper  Harper, Bellan, McWhorter & Williams, Jackson, Boyce Holleman, Gulfport, for appellees.
Norman Breland, Gulfport, for amicus curiae.
En Banc.
ROBERTSON, Justice, for the Court:

I.
Though great public interests and neither insignificant nor illegitimate private interests are present and in conflict, this in the end is a title suit. Plaintiffs, Cinque Bambini Partnership and others ("Cinque Bambini"), have brought an action to confirm title and remove clouds from title to 2400 acres of largely undeveloped property in Hancock County near the Mississippi Gulf Coast. As the lands are arguably tidelands, the State of Mississippi claims title in its capacity as trustee of the federally created public trust, vintage 1817, the year of statehood.
Accepting the State's view of the geographical contours of the public trust, the Chancery Court of Hancock County ruled that the State owns 140.863 of the 2400 acres Cinque Bambini claims. Ninety-eight of the 140 plus acres consist of two lakes that were dredged by the State's general contractor in the mid-1960s to obtain fill material for construction of Interstate Highway I-10. The remaining forty-two plus acres consist of the north branch of Bayou LaCroix and eleven small drainage streams ranging in size from .44 acres to 9.966 acres. The total surface area for six of the streams is less than one acre each.
The private landowners, Cinque Bambini, et al, claiming under Spanish grants purportedly confirmed by the Congress of the United States, have appealed arguing, inter alia, that the Chancery Court erred in the definition of the geographical contours of the public trust.
For the reasons explained below, we hold that fee simple title to all lands naturally *511 subject to tidal influence, inland to today's mean high water mark, is held by the State of Mississippi in trust. On the other hand, lands brought within the ebb and flow of the tide by avulsion or by artificial or nonnatural means are owned by their private record titleholders. We affirm in part and reverse in part.

II.
There are no material disputes in the facts. Cinque Bambini and others are vested with record title, derived from pre-statehood Spanish land grants said to date back to April 15, 1813 and to have been expressly confirmed by Acts of the Congress, and from federal and state patents. This avails Cinque Bambini nothing, however, if the lands in dispute are a part of those held by the State of Mississippi by virtue of a trust created at the time Mississippi was admitted to the Union in 1817. For all practical purposes, the case turns on whether the disputed lands are a part of the public trust.
The present dispute seems to have its genesis in the Coastal Wetlands Protection Law enacted by the Mississippi Legislature in 1973. Miss. Code Ann. § 49-27-1 thru -69 (Supp. 1985). This law charged the Mississippi Marine Resources Council (MMRC) with preparing maps identifying the stateowned wetlands. These maps were made by state employees who "eyeballed" aerial photographs to determine the boundaries of the wetland areas. The purpose of these maps was to provide a method whereby the MMRC could determine whether any given event was occurring on land in its jurisdiction  that is, in a wetlands area. These wetland maps were recorded in the office of each chancery clerk in the three coastal counties.
Notwithstanding these beginnings, the issue of the day, pragmatically speaking, appear to be, who will enjoy the revenues from anticipated oil and gas exploration. Contrary to instructions from the MMRC  who warned that the maps were inaccurate and for jurisdictional purposes only  the Mississippi Mineral Lease Commission used these wetland maps to delineate the stateowned land upon which it would then sell oil and gas leases. In following this practice, the Lease Commission leased 600 acres of land  record title to which resided in Cinque Bambini, et al  to Saga Petroleum U.S., Inc. in 1977. These leases were recorded in the Office of the Chancery Clerk for Hancock County, Mississippi.
When Cinque Bambini, et al, learned of these oil leases, they brought suit to confirm and remove clouds from their title. The State of Mississippi answered and counterclaimed. From an adverse ruling regarding the geographical contours of the public trust, Cinque Bambini and the other private landowners appeal.

III.
Prior to Mississippi's statehood, title to all property within what became this state's geographical confines was vested in the federal sovereign, the United States of America, subject to exception to be explained in Section V below. This included all surface waters, as well as the lands and beds of those waters and streams.
At the time of statehood, the United States created two great public trusts and conveyed to each new state, including the State of Mississippi, lands to be held by the state for the public purpose. The first of these was the familiar school lands trust into which the sixteenth section from each township has been placed. Turney v. Marion County Board of Education, 481 So.2d 770, 776-77, 783-84 (Miss. 1985). The second trust, the one with which we are concerned today, had placed within it the tidelands and navigable waters of the state together with the beds and lands underneath same. See State ex rel. Rice v. Stewart, 184 Miss. 202, 234, 184 So. 44, 51 (1938). In each instance the federal sovereign, in recognition of public concerns which seem to override mere private interests, granted to the state fee simple title in *512 certain properties to be held by the state for the benefit of all of its people.[1]
The public purposes to which these lands and waters placed in the public trust may be devoted are not static. Over the years those purposes have come to include navigation and transportation, Rouse v. Saucier's Heirs, 166 Miss. 704, 146 So. 291 (1933); Martin v. O'Brien, 34 Miss. 21 (1857); commerce, Rouse v. Saucier's Heirs, 166 Miss. 704, 146 So. 291 (1933); fishing, State ex rel. Rice v. Stewart, 184 Miss. 202, 231, 184 So. 44, 50 (1938); bathing, swimming and other recreational activities, Treuting v. Bridge and Park Commission of City of Biloxi, 199 So.2d 627, 632-33 (Miss. 1967); development of mineral resources, Treuting v. Bridge and Park Commission of City of Biloxi, 199 So.2d 627, 633 (Miss. 1967); environmental protection and preservation, Miss. Code Ann. §§ 49-27-3 and -5(a) (Supp. 1985); the enhancement of acquatic, avarian and marine life, sea agriculture and no doubt others. See Marks v. Whitney, 6 Cal.3d 251, 491 P.2d 374, 98 Cal. Rptr. 790 (1971). Suffice it to say that the purposes of the trust have evolved with the needs and sensitivities of the people  and the capacity of trust properties through proper stewardship to serve those needs.
All of this came about as an outgrowth of federal implementation of the familiar equal footing doctrine. See e.g., Oregon ex rel. State Land Board v. Corvallis Sand and Gravel Co., 429 U.S. 363, 370-78, 97 S.Ct. 582, 586-91, 50 L.Ed.2d 550, 558-63 (1977); Pollard's Lessee v. Hagan, 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845). The original states withheld their tidelands and navigable waters from the United States at the time of adoption of the Constitution. Those lands and waters so reserved by the states were held in trust for the public benefit. See, e.g., Arnold v. Mundy, 6 N.J.L. 1 (1821). Thereafter, each new state was admitted to the Union on an equal footing with the original thirteen, viz. as each one of the thirteen held its tidelands and navigable waters in public trust the United States created like trusts in each new state.[2]Montana v. United States, 450 U.S. 544, 551, 101 S.Ct. 1245, 1251, 67 L.Ed.2d 493, 501 (1981). The point for the moment is that once Mississippi had been admitted to the Union and once the public trust had been created and funded, the role of the equal footing policy ended and title to the lands conveyed in trusts became vested in the state, subject, of course, to the trust. See Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363, 376, 97 S.Ct. 582, 590, 50 L.Ed.2d 550, 562 (1977); Illinois Central Railroad Co. v. Illinois, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892).
*513 Federal law recognizes state authority over trust properties as plenary;[3] once the trust was funded, so to speak, the federal role was spent. Oregon ex rel. State Land Board v. Corvallis Sand and Gravel Co., 429 U.S. 363, 371, 376, 97 S.Ct. 582, 587, 589, 50 L.Ed.2d 550, 558, 562 (1977). State law in turn prohibits disposition or use of trust property except in furtherance of the public purpose. International Paper Co. v. Mississippi State Highway Dept., 271 So.2d 395, 399 (Miss. 1972); Treuting v. Bridge and Park Commission of City of Biloxi, 199 So.2d 627, 633 (Miss. 1967); Money v. Wood, 152 Miss. 17, 118 So. 357 (1928). The Attorney General repeatedly and correctly states in his brief that the State may not convey fee simple title to properties so held in trust "unless it is for a higher public purpose and then only by legislative enactment". (Brief for Appellees and Cross-Appellant, filed April 18, 1984, at pp. 8, 16). See Illinois Central Railroad Co. v. Illinois, 146 U.S. 387, 452-54, 13 S.Ct. 110, 117-18, 36 L.Ed. 1018, 1042 (1892); Priewe v. Wisconsin State Land & Improvement Co., 93 Wis. 534, 67 N.W. 918 (1896) aff'd on reh., 103 Wis. 537, 79 N.W. 780 (1899).

IV.

A.
We are concerned fundamentally with the inland reach of the trust boundaries, with identification, geographically and topographically, of the lands held by the State of Mississippi in trust today. The initial step in that identification process requires that we ascertain exactly what properties were granted to the State in trust in 1817. As the federal settlor held title to all lands prior to statehood and the creation of the trust, and as it was that same federal settlor which determined under the equal footing doctrine which lands it would grant to the State and which it would reserve for patent to private citizens, the question of what lands were given to the State in trust is necessarily a question of federal law. Borax Consolidated v. City of Los Angeles, 296 U.S. 10, 22, 56 S.Ct. 23, 29, 80 L.Ed. 9, 17 (1935); California ex rel. State Lands Commission v. United States, 457 U.S. 273, 285 n. 14, 102 S.Ct. 2432, 2440 n. 14, 73 L.Ed.2d 1, 12 n. 14 (1982); Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363, 373, 97 S.Ct. 582, 588, 50 L.Ed.2d 550, 562 (1977).
What then are the federal principles by which we may establish on-the-ground surveyable boundaries of the properties granted the State of Mississippi in trust in the year 1817? We regard as settled the proposition that, insofar as federal law is concerned, the identity of properties granted by the United States in trust became fixed at the time of statehood. Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363, 376, 97 S.Ct. 582, 590, 50 L.Ed.2d 550, 562 (1977); United States v. Utah, 283 U.S. 64, 75, 51 S.Ct. 438, 440-41, 75 L.Ed. 844, 849 (1931); Goodtitle v. Kibbe, 50 U.S. (9 How.) 471, 477, 13 L.Ed. 220, 223 (1850).
The early federal cases refer to the trust as including all lands within the ebb and flow of the tide. Cinque Bambini argues, nevertheless, that "ebb and flow of the tide" should be translated "navigable waters" and cites several admiralty jurisdiction cases beginning with The Genessee Chief, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851). Cinque Bambini's position is that the surveyable boundaries of trust properties were redefined in a series of cases beginning with Martin v. Waddell, 41 U.S. (16 Pet.) 367, 10 L.Ed. 997 (1842) to include only those waters navigable in fact in 1817, tidal influence being essentially irrelevant. The State's position is that, in addition to *514 such navigable waters, the trust also includes all lands subject to the ebb and flow of the tide in 1817 and below the then mean high water mark. Resolution of this issue is outcome determinative of much of this case  and, apparently, is of enormous importance to the Mississippi Gulf Coast. We proceed with some temerity as we find no federal case expressly deciding this point of federal law  whether at the time of statehood tidally influenced non-navigable waters were included in the state owned public trust.
The evolution of the so-called redefinition of the trust suggests a clue or two. Originally, "tidewaters", "ebb and flow of the tide", and similar language dominated discussions of the trust. It soon became apparent, however, that many of the new states had no coastline and hence had no lands within the ebb and flow of the tide. If the equal footing doctrine was to have meaning in those inland states, something had to be done to the theretofore restrictive delineation of the trust lands. Following the comparable expansion of admiralty jurisdiction in The Genessee Chief, the Supreme Court expanded the definition of the trust to include all navigable freshwaters. See, e.g., McGilvra v. Ross, 215 U.S. 70, 30 S.Ct. 27, 54 L.Ed. 95 (1909); Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894), and more recently Montana v. United States, 450 U.S. 544, 551, 101 S.Ct. 1245, 1251, 67 L.Ed.2d 493, 501 (1981) and Utah v. United States, 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971). The question posed by these and many like cases is whether the advent of the navigable waters test is, on the one hand, a complete redefinition of the geographical scope of the trust, or, on the other hand, a mere addition to the tidelands/tidewaters trust applicable only in the case of non-tidally influenced freshwaters. Put another way, did the navigable waters test have the effect of removing from the Mississippi public trust properties once within it?
It is our view that, as a matter of federal law, the United States granted to this State in 1817 all lands subject to the ebb and flow of the tide and up to the then mean high water level, without regard to navigability. See Illinois Central Railroad Co. v. Illinois, 146 U.S. 387, 435-36, 13 S.Ct. 110, 111-12, 36 L.Ed. 1018, 1036 (1892); Money v. Wood, 152 Miss. 17, 28, 118 So. 357, 359 (1928). The more recent navigable waters test provides the insight which explains why this must be so. Navigable waters  whether the Mississippi River, the Pearl River, the Yazoo River or any other natural waterway in this state navigable in fact  by their very nature contain deeper areas that are navigable and more shallow areas, near the riverbank, up in chutes, over bars and the like, that are not. The State's original title to these waters included the navigable as well as the non-navigable parts. See Montana v. United States, 450 U.S. 544, 551, 101 S.Ct. 1245, 1251, 67 L.Ed.2d 493, 501 (1981). The same of tidewaters. The State of Mississippi was granted in trust certain tidelands fronting the Gulf of Mexico, extending inland up to the 1817 mean high water mark. Some of those areas were at the time navigable in fact and some were not. But the Gulf of Mexico as a whole  even only to the outer limits of Mississippi's territorial limits  is navigable by anyone's definition. That there may be non-navigable areas held by the State in trust is no more anomalous in the case of tidewaters than freshwaters.
Navigable freshwaters do not always strike the riverbank at the same point. Rivers rise and fall, seasonally and with the rains. A more constant boundary of necessity has been found  the high water mark. The Gulf of Mexico, however, shifts its boundaries far more often  as the tide daily ebbs and flows, or, more precisely, as the waters interact gravitationally with the moon. Established and accepted scientific methods enable us to establish a mean high water mark  frequently referred to as mean high tide. See Borax Consolidated, Ltd. v. City of Los Angeles, 296 U.S. 10, 22-27, 56 S.Ct. 23, 29-31, 80 L.Ed. 9, 18-20 (1935); and O'Neill v. State Highway Department, 50 *515 N.J. 307, 235 A.2d 1, 9-10 (1967). That mark is not a line observable on the ground, although it may be plotted by surveyors trained in the field. When plotted we confront the geographical reality of a continuous, unbroken line wildly meandering, to be sure, but reaching from Alabama on the east in uninterrupted sequence to Louisiana on the west. This line is  in theory, at least  ascertainable as of 1817. Federal law recognizes it as the inland boundary of the navigable tidewaters of the State of Mississippi. Fee simple title to all areas south of it was granted to the State in trust.
What emerges is that the legal boundaries of navigable tidewaters are conceptually and functionally the same as those for navigable freshwaters. The high water mark concept is used in both instances. That sophisticated geophysical study by reference to the tidal epoch and the like may customarily be employed in the establishment of mean high tide, while simpler processes are used with navigable rivers, is of no moment. Recognition of the conceptual equivalence of these two approaches to the establishing certain boundaries for present purposes serves to make clear that the navigable waters test was no new test but the removal of an arbitrary and irrational limitation on the old ebb and flow test. In each instance  freshwaters or tidewaters  the central focus is upon navigable waters, but no one has ever suggested that the boundaries of that granted in trust were the contours of the navigable channel. The boundary of each waterway navigable in fact is that point where mean high water mark (variously determined) strikes land. Within that surveyable, territorial boundary (and outside the navigable channel/area) will always be some non-navigable areas. Yet so long as by unbroken water course  when the level of the waters is at mean high water mark  one may hoist a sail upon a toothpick and without interruption navigate from the navigable channel/area to land, always afloat, the waters traversed and the lands beneath them are within the inland boundaries we consider the United States set for the properties granted the State in trust.
What was granted the State in trust in 1817 is a function of the positive law of the United States. We are not so much concerned with ascertaining what the federal government intended to grant as with what it did grant. Still, when there is a haze about the contours of what the federal government did grant, it is by no means inappropriate to consider purposes then known as an aid to extrapolation of the geographical boundaries of the grant.
No doubt commerce and navigation were considered vitally important. But fishing and bathing have long co-existed with commerce and navigation as public purposes. Martin v. Waddell's Lessee, 41 U.S. (16 Pet.) 367, 412-414, 10 L.Ed. 997, 1013 (1842). Waters that are valuable for fishing and bathing purposes often are not navigable in fact  at least not at the point where the fishing and bathing takes place. The point is that exclusion of non-navigable tidewaters from the trust in 1817 would have been inconsistent, if not downright irrational, given then accepted public purposes.
We are reinforced in our view by the fact that the federal cases have continued to use "tide" terminology long after the recognition that non-tidal freshwaters were included in the trust. See, e.g., Summa Corp. v. California ex rel. State Land Commission, 466 U.S. 198, 204-05, 104 S.Ct. 1751, 1755, 80 L.Ed.2d 237, 243 (1984) ("tidelands"); Borax Consolidated, Ltd. v. City of Los Angeles, 296 U.S. 10, 16, 23, 56 S.Ct. 23, 26, 29, 80 L.Ed. 9, 14, 18 (1935) ("tidelands", "ebb and flow of the tide"); McGilvra v. Ross, 215 U.S. 70, 79, 30 S.Ct. 27, 31, 54 L.Ed. 95, 100 (1909). If the navigable waters test had replaced the ebb and flow test, rather than merely extending it to freshwaters, one would have expected the former language to have disappeared. Of course, as explained above, subject to geophysical differences between tidewaters and freshwaters, what has happened in the case of the inland states' public trusts at the time of The Genessee Chief *516 and since has been nothing more than a principled extension to freshwaters of the test long employed with tidewaters.

B.
Though we consider here a question of federal law, we may hardly ignore our prior public trust cases. We find those cases consistent with what has been said above. This Court has repeatedly stated its understanding of the geographical scope of the federally created trust as including, at least,
the soil, and ... the minerals therein contained, the beds of all its shores, arms and inlets of the sea, wherever the tide ebbs and flows.
State ex rel. Rice v. Stewart, 184 Miss. at 230, 184 So. at 49.
Rouse v. Saucier's Heirs, 166 Miss. 704, 146 So. 291 (1933) recognizes the inland extent of the federal grant in trust as including
title to all land under tidewater, including the spaces between ordinary high and low water marks; . .. .
166 Miss. at 713, 146 So. at 292; see also International Paper Co. v. Mississippi State Highway Dept., 271 So.2d 395, 397-98 (Miss. 1973).
Cinque Bambini argue that our cases to date have failed to recognize as within the federal grant any tidal waters which were not navigable in fact. See State v. Hanson Properties, Inc., 371 So.2d 871, 872 (Miss. 1979) (Lowery Island at confluence of Pascagoula River with Mississippi Sound); H.K. Porter Co., Inc. v. Board of Supervisors of Jackson County, 324 So.2d 746, 747 (Miss. 1975) (Mississippi Sound Bayou Casotte Ship Channel); International Paper Co. of Moss Point v. Mississippi State Highway Department, 271 So.2d 395, 396 (Miss. 1972) (Lowery Island at confluence of Pascagoula River with Mississippi Sound); Treuting v. Bridge and Park Commission of the City of Biloxi, Mississippi, 199 So.2d 627, 629 (Miss. 1967) (Mississippi Sound); Giles v. City of Biloxi, 237 Miss. 65, 72, 112 So.2d 815, 816 (1959) (Deer Island in Mississippi Sound); Xidis v. City of Gulfport, 221 Miss. 79, 83, 72 So.2d 153, 154-55 (1954) (Mississippi Sound); Crary v. State Highway Commission, 219 Miss. 284, 287-88, 68 So.2d 468, 469 (1953) (Bay of St. Louis); State ex rel. Rice v. Stewart, 184 Miss. 202, 219, 184 So. 44, 45 (1938) (Bayou Bernard, an admitted commercially navigable portion of Biloxi Back Bay); Rouse v. Saucier's Heirs, 166 Miss. 704, 711, 146 So. 291, 291 (1933) (Wolfe River, a commercially navigable river flowing into the Bay of St. Louis); Money v. Wood, 152 Miss. 17, 24, 118 So. 357, 358 (1928) (Deer Island in Mississippi Sound); Martin v. O'Brien, 34 Miss. 21, 27-29 (1857) (Hancock County Beachfront "Seacoast" at town of Shieldsborough). Cinque Bambini overlooks the fact that, from the area of the waters in controversy in each of these cases, our proverbial toothpick sailboat may navigate landward in a generally northward direction toward the point where mean high water mark intersects with land and, always afloat, cross naturally existing areas comparable to those in controversy here.
That today's case may arguably require that we confront for the first time the State's claim to tidally influenced lands that were not navigable in fact in 1817 need not detain us. Whatever unique facts may appear in the various cases that have heretofore been adjudicated, we have always proceeded upon general principles. Those principles  federal principles  have been repeated too often  here as elsewhere  to admit of serious doubt.
In summary, effective upon statehood on March 1, 1817, we understand federal law to provide that the United States granted to the State of Mississippi in trust all lands, to which the United States then held title, including their mineral and other subsurface resources, subject to the ebb and flow of the tide below the then mean high water level  regardless of whether the water courses were commercially navigable at the time of Mississippi's admission into the Union, regardless of how insignificant the tidal influence, or how shallow the water, regardless of how far inland and *517 remote from the sea. Similarly granted were the beds and streams of all non-tidal waters which were navigable in fact in 1817. This act of creation consummated, the federal sovereign rested.

C.
Nothing in Morgan v. Reading, 11 Miss. (3 S. & M.) 366 (1844) or Steamboat Magnolia v. Marshall, 39 Miss. 109 (1860) is to the contrary. To be sure, shallow, non-navigable freshwater streams and the beds beneath same are under our law susceptible of private ownership. Neither federal nor state law has ever held such areas inalienable from the public trust. This premise, however, has never been held, directly or by implication, to exclude tidally influenced, non-navigable streams from the public trust.
What Cinque Bambini, et al, have identified here is not support for their claims but a logical incongruity in our law. It may well be that there is no reasoned basis for including small, non-navigable tidewaters within the trust while non-navigable freshwaters are without. That the distinction may not be well reasoned, however, does not keep it from being well settled.
A similar logical incongruity appears in the treatment of the beds of navigable freshwaters as distinguished from the beds of tidewaters. Thanks to the redefinition work done in Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894); McGilvra v. Ross, 215 U.S. 70, 30 S.Ct. 27, 54 L.Ed. 95 (1909); and other similar cases  brought about by the application of the equal footing doctrine to new, interior states having no tidewaters, navigable freshwaters are held by the states in trust. This is true in Mississippi as elsewhere. Yet before anyone perceived that the trust extended to navigable freshwaters, Mississippi had already adopted the common law rule that riparian owners hold the beds of such waters to the center of the stream. See Morgan v. Reading, 11 Miss. (3 S. & M.) 366, 399 (1844).[4] This has placed Mississippi's trust in an anomalous position: while the lands below tidewaters may not be alienated except for high public purposes and generally only with consent of the legislature, lands below navigable freshwaters are susceptible of wholly private ownership.[5] The United States Supreme Court has ducked this anomaly by holding that, after statehood, state law controls practically everything. Oregon ex rel. State Land Board v. Corvallis Sand and Gravel Co., 429 U.S. 363, 378-81, 97 S.Ct. 582, 590-92, 50 L.Ed.2d 550, 563-65 (1977); Barney v. Keokuk, 94 U.S. 324, 338, 24 L.Ed. 224 (1876).
In the end, rather than affording Cinque Bambini a basis for relief, these anomalies are merely further evidence of the perceptiveness of Holmes' sage observation that the life of the law has been experience, not logic.[6]

V.
A corollary of the federal rule articulated in Section IV above is the invalidity of an interest in trust lands claimed under a federal patent granted after the funding of the trust. "An ordinary federal *518 patent purporting to convey tidelands located within a state to a private individual is invalid, ..." Summa Corp. v. California ex rel. State Lands Commission, 466 U.S. 198, 205, 104 S.Ct. 1751, 1756, 80 L.Ed.2d 237, 243 (1984). If the federal patent was granted before statehood, it ran afoul the obligation of the United States to hold such tidelands only in trust for the state. Borax Co. v. Los Angeles, 296 U.S. 10, 15-16, 56 S.Ct. 23, 80 L.Ed. 9 (1935). If the federal patent was granted after statehood, it was a nullity as it necessarily purported to operate upon interests in real property which, at least insofar as federal law was concerned, had been conveyed to the states in trust  and irrevocably so.
These principles hold only with respect to property fee simple title to which was in the United States at and prior to statehood. If, at the time of acquisition by the United States in its sovereign capacity, property was already privately owned, it follows on reason that the title was never in the United States and therefore could not have been held by the United States in trust nor thereafter at statehood granted to the state.
Against this backdrop Cinque Bambini, et al, argue that they hold under Spanish grants dating from April 15, 1813  four years pre-statehood. These Spanish grants, we are told, had the effect that the United States never acquired title; hence, none could be held for or granted to the State of Mississippi as a part of the public trust. There is precedent for this view in the case of ceded territory where tidelands were, prior to cession, privately owned under grants from Mexico. See Summa Corp. v. California ex rel. State Lands Commission, 466 U.S. 198, 204-09, 104 S.Ct. 1751, 1756-58, 80 L.Ed.2d 237, 243-46 (1984); Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363, 375, 97 S.Ct. 582, 589, 50 L.Ed.2d 550, 561 (1977); Knight v. United States Land Association, 142 U.S. 161, 183, 12 S.Ct. 258, 264, 35 L.Ed. 974, 982 (1891).
We find it suggested, however, that no recognition is accorded titles to lands in Spanish West Florida held under Spanish grants after 1783. Pollard's Lessee v. Hagan, 44 U.S. (3 How.) 212, 226, 11 L.Ed. 565, 572 (1845); Henderson v. Poindexter, 25 U.S. (12 Wheat.) 530, 535-36, 6 L.Ed. 718, 719-20 (1827). In the latter cited case the Supreme Court concluded
It follows, that Spanish grants, made after the treaty of peace [September 1783], can have no intrinsic validity, and the holders must depend for their titles on the laws of the United States.
25 U.S. (12 Wheat.) at 535, 6 L.Ed. at 720. See also, Montgomery v. Ives, 21 Miss. 161 (1849); and Doe ex dem. Nevitt v. Beaumont, 7 Miss. 237 (1842).
All of the cases noted above  Pollard, Henderson, Montgomery and Nevitt  factually concern lands and waters above 31 degrees North latitude. Concededly, the Spanish claim to West Florida below the 31st parallel was far more legitimate that above it. In our view the same result obtains. On October 27, 1810, President Madison proclaimed West Florida south of the 31st parallel a part of the United States.[7] On February 12, 1812, the Congress authorized the President to take West Florida below the 31st parallel. 3 Stat. 472 (1812). On May 14, 1812, the area with which we are here concerned was formally annexed to the Mississippi Territory. 2 Stat. 734 (1812).
Cinque Bambini, et al, claim under Spanish grants said to be dated from April 15, 1813. Such grants came too late. The Acts of Congress of March 3, 1819, May 8, 1822, and May 28, 1830 are of no force and effect, for such title to these lands as may ever have been held by the United States was effectively and irrevocably granted to the State of Mississippi on the occasion of statehood in 1817.

VI.
The extent of the federal grant settled, we know only of the content of the trust in *519 1817. Waters and the courses they follow and the contours of the lands they adjoin are dynamic, though often imperceptibly so. Properties placed in Mississippi's public trust  tidelands or navigable freshwaters  share this characteristic. This leads to our concern whether the legal boundaries of the trust properties are similarly dynamic.
As explained above, effective upon statehood all tidelands and navigable waters were granted to the State in trust. The trust properties as of that date had distinct surveyable boundaries. The question is whether those boundaries today are the same as those fixed and surveyable  in theory, at least  in 1817. Federal law, it will be recalled, spent its force when the trust was originally funded. As of that moment, in the eyes of federal law, the State became a titleholder in this context like unto any private owner. The trust conditions and purposes subject to which the State then held in no way altered its status from that of a mere titleholder vis-a-vis adjoining or contiguous landowners.
Whether the operation of the forces of nature could thereafter add to or subtract from the properties so held by the State is a matter wholly governed by state law. Oregon ex rel. State Land Board v. Corvallis Sand and Gravel Co., 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977).
Insofar as may be relevant to the case at bar, our law has generally accepted contours. Ordinarily the owner of water bounded lands is entitled to accretions thereto. H.K. Porter Co., Inc. v. Board of Supervisors of Jackson County, 324 So.2d 746, 751 (Miss. 1975); Paepcke v. Kirkman, 55 F.2d 814, 815 (5th Cir.1932) (citing Mississippi law); Anderson-Tully Company v. Franklin, 307 F. Supp. 539, 542 (N.D.Miss. 1969). These include gradual deposit of alluvial soil upon margin of water or gradual recession of waters, Harrison County v. Guice, 244 Miss. 95, 140 So.2d 838 (1962). Accretions may grow and develop adjacent to tidelands or the shores of freshwaters. See Shively v. Bowlby, 152 U.S. 1, 35, 14 S.Ct. 548, 561, 38 L.Ed. 331, 344 (1894). With regard to public trust tidelands, our law is settled that title to tracts not in existence at the time of the federal grant but formed subsequently by deposits of silt, soil, etc. from a river, is held by the state. H.K. Porter Co., Inc. v. Board of Supervisors of Jackson County, 324 So.2d 746, 751 (Miss. 1975); International Paper Co. v. Mississippi State Highway Dept., 271 So.2d 395, 398 (Miss. 1973). The public trust, vintage 1817, may be augmented by accretions and by the natural inland expansion of the tidal influence.
Ordinarily, of course, a private landowner may lose title to lands via reliction as well as gain it via accretion. Anderson-Tully Co. v. Tingle, 166 F.2d 224 (5th Cir.1948) (applying Mississippi law). Our cases suggest that, once held by the state in trust, properties are committed to the public purpose and may be alienated from the state only upon the authority of legislative enactment and then only consistent with the public purposes of the trust. State of Mississippi v. Hanson Properties, Inc., 371 So.2d 871, 873 (Miss. 1979); International Paper Co. v. Mississippi State Highway Dept., 271 So.2d 395, 398-99 (Miss. 1973); Treuting v. Bridge and Park Commission of City of Biloxi, 199 So.2d 627 (Miss. 1967). Today's decision does not require that we decide whether the State may lose title to trust lands through reliction and we intimate no opinion thereon, except again to note that the question is wholly one of state law. Oregon ex rel. State Land Board v. Corvallis Sand and Gravel Co., 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977).
The geophysical tidal experience may enlarge the trust properties. If over decades, epochs or even centuries the tides rise  that is, the mean high water mark rises (and there is reason to believe this has happened and may continue to happen)  the inward reach of the tidal influence expands.[8] *520 More lands are tidally affected. On principle there is no way our law may allow a riparian freshwater title holder the benefit of accretions and deny the owner of tidelands the benefits of the natural inland expansion of the tidal influence. Sufficient unto this day is our holding that, where the forces of nature  gradually and imperceptibly  have operated to expand or enlarge the inland reach of the ebb and flow of the tide, the new tidelands so affected accrete to the trust. Put otherwise, state law decrees that the surveyable outer boundary of the trust in the area here in controversy is today's mean high water line,[9] regardless of the absence of a tidal influence in 1817, of how far inland and remote from the sea, and regardless of how shallow or how insignificant the tidal influence, subject only to the exception discussed in Section VII below. See O'Neill v. State Highway Department, 50 N.J. 307, 235 A.2d 1, 9-12 (1967).

VII.
By way of contrast to our law regarding accretion and reliction, boundaries and titles are not affected by avulsion. Nix v. Dickerson, 81 Miss. 632, 643, 33 So. 490 (1903); Anderson-Tully Co. v. Franklin, 307 F. Supp. 539, 541 (N.D.Miss. 1969). It is this general principle that generates doubt regarding at least a part of the Chancery Court's decision, that declaring as the property of the state lands theretofore without the surveyable boundaries of the trust but brought within the ebb and flow of the tide by the dredging for fill material used in construction of Interstate Highway I-10.
An avulsion is a change in a boundary body of water so rapid or sudden, or in such a short time, that the change is directly perceptible or measurably visible at the time of its progress. Sharp v. Learned, 195 Miss. 201, 215, 14 So.2d 218, 220 (1943); Anderson-Tully Company v. Franklin, 307 F. Supp. 539, 541-42 (N.D.Miss. 1969). We perceive no reason on principle for exclusion from this notion of a change of water course boundary artificially induced by the dredging process.
Put more broadly, under the laws of this state neither artificially created water courses, inlets, slips, marinas and the like, nor physical improvements or alterations made thereto, become a part of the public trust, even though they may become tidally affected. Leaving aside claims of navigation, ingress and egress, title to such artificially created "tidelands", and the beds beneath the waters as well, remains in the record titleholder. Only those lands, not tidelands in 1817, which have become such via the natural process of accretion or the general rising or inland expansion of the tide have in law been added to the trust so that title is held by the State.
For an additional reason, the two lakes created by dredging for fill material used in construction of Interstate Highway I-10 (to the extent that each lake was not naturally within the ebb and flow of the tide on the date the dredging commenced) do not belong to the state. The State has not paid for these lands. To strip these artificially created tidelands from their record title holders would constitute a taking within the Fifth and Fourteenth Amendments to the Constitution of the United States and Article 3, § 17, Mississippi Constitution of 1890, which at the very least would require that the state pay just compensation. See Kaiser Aetna v. United States, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

VIII.
Finally, Cinque Bambini argues that the grants and patents under which they hold are entitled to a presumption of validity. *521 In the alternative, the State should in equity be estopped from challenging same.
The first argument is answered by what has been said above. Grants and patents which as a matter of law could convey nothing  because the properties were already in the public trust  are entitled to no presumption of validity. Even those grants and patents which in other contexts may be presumed valid, e.g., State v. Stockett, 249 So.2d 388 (Miss. 1971), are subject to gain or loss via accretion or reliction.
In support of its alternative theory, Cinque Bambini have called to our attention no case wherein the State of Mississippi has been held estopped, equitably or otherwise, to assert title to and dominion over properties otherwise within the public trust, and our independent research has revealed no such case. Furthermore, the facts presented here do not support a claim of equitable estoppel. See, e.g., Chapman v. Chapman, 473 So.2d 467 (Miss. 1985); PMZ Oil Co. v. Lucroy, 449 So.2d 201 (Miss. 1948).
Moreover, the State's delay in assertion of dominion over these tidelands does not give rise to an estoppel. The State's title may not be lost via adverse possession, limitations or laches. Miss.Const. Art. 4, § 104 (1890); Gibson v. State Land Commissioner, 374 So.2d 212, 216-17 (Miss. 1979); Alexander v. Mayor and Board of Aldermen of City of Natchez, 219 Miss. 78, 94, 68 So.2d 434, 441 (1953); O'Neill v. State Highway Department, 50 N.J. 307, 235 A.2d 1, 10 (1967). Under no circumstances may title held by the State for the public use or benefit be so lost. City Of Bay St. Louis v. Board of Supervisors of Hancock County, 80 Miss. 364, 371, 32 So. 54 (1902); Bates v. Aven, 60 Miss. 955, 960-62 (1883).

IX.
Finally, we consider the State's counterclaim which is presented via cross-appeal. In the court below the State sought to recover from Cinque Bambini the value of dirt removed from the bottom of Bayou Enceinte and its adjacent land area in conjunction with the Highway I-10 construction project. From the Chancery Court's denial of this counterclaim, the State appeals.
To the extent that this dirt or fill material may have come from areas today held outside the public trust  see Section VII above, the counterclaim and cross-appeal, of course, must fail. To the extent that this dirt may have come from properties within the trust, we concur with the Chancery Court that the claim must fail for impossibility of proof.

X.
In the proceedings below much technical data regarding surveying methods and the like was presented and considered. The Chancery Court's comprehensive memorandum of decision and final decree necessarily concluded with the establishment of precise, surveyed boundaries separating the properties held by the State in trust from those owned by Cinque Bambini, et al.
This appeal and the assignments of error we have been tendered, however, address only the broad, general principles which must be settled before permanent surveyed or surveyable boundaries may be established. Above we have discussed and tried to make clear the applicable general principles, and in one important particular we have found the Chancery Court in error.
In simpler cases with less at stake, we would finally decide the matter here, viz., we would affirm in part and reverse in part and render. Establishment on the ground and in the land records of the precise outer boundaries of the public trust properties  today  will necessarily involve an interaction between counsel, surveyors and other experts, and the court, an interaction of an extent and nature more compatible with the institutional structure of the Chancery Court than this Court. Accordingly, so much of the final decree below as may be found inconsistent with what we have said above is vacated and the matter is remanded *522 to the Chancery Court for such further proceedings as may be appropriate.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER, SULLIVAN and ANDERSON, JJ., concur.
NOTES
[1] Much scholarly commentary regarding the nature, scope and history of the public trust has been published in recent years. See, e.g., Sax, The Public Trust Doctrine In Natural Resource Law: Effective Judicial Intervention, 68 Mich.L. Rev. 473 (1970); Sax, Liberating The Public Trust Doctrine From Its Historical Shackles, 14 U.C.Davis L.Rev. 185 (1980); Stevens, The Public Trust: A Sovereign's Ancient Prerogative Becomes The People's Environmental Right, 14 U.C.Davis L.Rev. 195 (1980); and Note, The Public Trust In Tidal Areas: A Sometime Submerged Traditional Doctrine, 79 Yale L.J. 762 (1970). An excellent discussion of the mapping of coastal boundaries is found in Maloney, et al, The Use And Significance Of The Mean High Water Line In Coastal Boundary Mapping, 53 No.Cer.L. Rev. 185 (1974). Trouble spots are discussed in Porro, et al, Marshland Title Dilemma: A Tidal Phenomenon, 3 Seton Hall L.Rev. 323 (1972). An articulate voice in dissent appears in Jampol, The Questionable Renaissance Of The Tidelands Trust Doctrine In California, 13 Southwestern U.L.Rev. 1 (1982). Nothing said here should be taken as endorsement of the views expressed in any of these articles. Collectively, they provide a valuable context for understanding the public trust doctrine and its importance, yesterday and today.
[2] The Act of March 1, 1817, authorizing the formation of the State of Mississippi provided that the new state should

be admitted into the Union upon the same footing with the original states in all respects whatever.
3 Stat. 348 (1817).
The conditions of the March, 1817, enactment having been met, the Congress of the United States on December 10, 1817 formally admitted Mississippi
into the Union on an equal footing with the original states, in all respects whatever.
3 Stat. 472, 473 (1817).
[3] Though not relevant here, the State's interests in the trust property have remained subject to "the paramount power" of the United States to regulate navigability pursuant to the commerce clause. Montana v. United States, 450 U.S. 544, 551-52, 101 S.Ct. 1245, 1251, 67 L.Ed.2d 493, 501-02 (1981); Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363, 375-76, 97 S.Ct. 582, 589, 50 L.Ed.2d 550, 561 (1977); Rouse v. Saucier's Heirs, 166 Miss. 704, 713, 146 So. 291, 292 (1933).
[4] For an exhaustive consideration of the various approaches other states have taken to the question of riparian owners' rights, see Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894). The currently authoritative consideration of the role of federal law on this point is Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363, 378-81, 97 S.Ct. 582, 590-92, 50 L.Ed.2d 550, 563-65 (1977).
[5] This Court recognized the dilemma in State ex rel. Rice v. Stewart, 184 Miss. 230, 184 So. 44 (1938)

We shall not attempt to argue the reasonableness or unreasonableness of the distinction, but shall concern ourselves only with determining whether or not such distinction does in fact [and in law] exist.
184 So. at 47.
[6] In 1881 Holmes first said this in The Common Law on page one: "The life of the law has not been logic: it has been experience." Forty years later he repeated the point more metaphorically: "... [A] page of history is worth a volume of logic." New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963, 983 (1921).
[7] See Abernathy, The South In The New Nation 358 (1961); and McLemore, ed., A History Of Mississippi, vol. 1, p. 226 (1973), for historical discussions of the annexation of West Florida.
[8] See generally, Lowenstein, "The Restive Beaches" 88 Technology Review 50-57 (1985); Pilkey, et al, "Rising Seas, Shifting Shores", 15 Oceans 65-69 (1982).
[9] For a thoughtful consideration of the use of the mean high water line as a coastal boundary, see Maloney, et al, The Use And Significance Of The Mean High Water Line In Coastal Boundary Mapping, 53 No.Car.L.Rev. 185, 243-262 (1974).