# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-CA-00067-SCT

***KYLE DEW AND MOSSY WOODS & WATERS
LLC, A MISSISSIPPI LIMITED LIABILITY
COMPANY***

***v.***

***GREENWOOD LEFLORE CONSOLIDATED
SCHOOL DISTRICT AND MOSSY BRAKE
HUNTING CLUB, A NON-PROFIT
CORPORATION***

| | |
|---|---|
| DATE OF JUDGMENT: | 12/19/2023 |
| TRIAL JUDGE: | HON. WATOSA MARSHALL SANDERS |
| TRIAL COURT ATTORNEYS: | CHARLES JONES SWAYZE, III |
| | CHARLES J. SWAYZE, JR. |
| | CARLOS DIALLO PALMER |
| | RISHER GRANTHAM CAVES |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | RISHER G. CAVES |
| ATTORNEYS FOR APPELLEES: | CHARLES J. SWAYZE, III |
| | CHARLES JONES SWAYZE, JR. |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND REMANDED - 10/16/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE COLEMAN, P.J., CHAMBERLIN AND GRIFFIS, JJ.**

**COLEMAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Kyle Dew and Mossy Woods & Waters LLC appeal the Leflore County Chancery Court's grant of Greenwood Leflore Consolidated School District's motion for declaratory judgment and motion for summary judgment. Because the trial court incorrectly determined that the school district held title to waters in the public waters trust, the judgment is reversed and the case is remanded for proceedings consistent with the opinion.

## FACTS

¶2. On April 21, 2023, Greenwood Leflore Consolidated School District and Mossy Brake Hunting Club (collectively, "the School District") filed a complaint to quiet and confirm title and for injunctive relief against Kyle Dew and Mossy Woods & Waters LLC (collectively, "Dew"). The School District alleged that it is the sole rightful owner of the fraction of Mossy Lake located on the sixteenth section of Township Number 17, Range Number 2 West. The district currently leases that portion of Mossy Lake to the Mossy Brake Hunting Club for hunting, fishing, and trapping purposes. The complaint alleged that, on January 8, 2023, Dew was trespassing on the district's property when he was found on Mossy Lake.

¶3. In response, Dew filed a counterclaim asserting that Mossy Lake is a public waterbody, thus he was not trespassing. He argued that, as a littoral landowner whose property abuts the lake, he has the right to use it. Dew also asked the chancery court to declare that the public waters trust supersedes the sixteenth section trust.

¶4. On August 23, 2023, the School District filed a motion for declaratory judgment or, in the alternative, summary judgment, in which it reiterated its claims and asserted that there were no genuine issues of material fact. On October 27, 2023, Dew responded with his own motion for summary judgment or, alternatively, for declaratory judgment, arguing that there were no genuine issues of material fact as to his counterclaims. He also raised claims for injunctive relief, public nuisance, adverse possession, and attorneys' fees.

¶5. After a hearing on the matter and a visit to the lake by the court, the chancellor

2

determined that Mossy Lake is approximately 926[1] acres in total size and that the School District's leasehold covers only a small portion of the lake. The court granted the School District's motion for declaratory judgment, or, in the alternative, summary judgment. In the same order, the court denied Dew's motion and made several findings.

¶6.     The chancery court found that the public waters trust does not supersede the sixteenth section trust and that, in the event of a conflict, the sixteenth section trust prevails because its purpose is of higher importance. It also found that Dew was not entitled to summary judgment due to the presence of a genuine issue of material fact regarding his claims. The chancery court concluded that Dew had neither adversely possessed nor established a prescription right on the portion of Mossy Lake situated on the sixteenth section.

¶7.     Additionally, the chancery court determined that even if Mossy Lake is an Oxbow Lake, Dew remains subject to state regulation, and sixteenth section lands are managed by Mississippi's Department of Education. The trial court rejected Dew's argument that his status as a littoral landowner permitted him to enter the lake on sixteenth section land. It also found that Dew did not need injunctive relief to fish, hunt, or trap on other parts of the lake, as he could do so without encroaching on the sixteenth section portion. The chancery court declared that the state of Mississippi owns the sixteenth section land, with the School District serving as manager and supervisor. It further found that the lease between the School District and the hunting club was valid. Accordingly, the court confirmed and quieted title

---

[1]Parties aver that Mossy Lake is approximately 196 acres.

3

in favor of the School District and the hunting club and enjoined all individuals from trespassing on that section of Mossy Lake. The School District and hunting club were authorized to continue posting no-trespassing signs.

¶8. Dew appealed, raising six issues: whether the chancery court erred by

I. finding it irrelevant to determine whether Mossy Lake is a public waterbody;

II. declaring that the sixteenth section trust is superior to the public waters trust and equal footing doctrine;

III. confirming and quieting title to a portion of the surface and lakebed of Mossy Lake in favor of the School District;

IV. finding that Kyle Dew committed trespass;

V. enjoining Dew from using a portion of Mossy Lake; and

VI. awarding attorneys' fees to the School District.

¶9. Because Mossy Lake has been a part of the public waters trust since the founding of our state, it did not accrue to the sixteenth section when the section was originally surveyed. The School District has no right to exclude citizens who legally access the waters of the lake. Therefore, we reverse the judgment of the chancery court on all issues and remand the case to the chancery court for further proceedings.

## STANDARD OF REVIEW

¶10. A chancery court's interpretation and application of law is reviewed *de novo*. ***Tucker v. Prisock***, 791 So. 2d 190, 192 (¶ 10) (Miss. 2001) (citing ***Adams v. Carney (In re Will of Carney)***, 758 So. 2d 1017, 1019 (Miss. 2000)).

4

## ANALYSIS

¶11.    The question before the Court today is straightforward.  Just as Justice Robertson wrote for the Court in *Cinque Bambini Partnership v. State*, 491 So. 2d 508, 510 (Miss. 1986), though "public interests and neither insignificant nor illegitimate private interests are present and in conflict, this in the end is a title suit."  What party has property rights in the waters of the fraction of Mossy Lake that lies in the sixteenth section?

*I.        Sixteenth Section Trust*

¶12.    As a condition for its admission to the Union, the state of Mississippi agreed to enact the land survey system first established by the Land Ordinance of 1785.[2]   The system mandated that federal lands in the territory would be surveyed into square townships, each measuring six miles on a side, and further subdivided into thirty-six sections of 640 acres each.  As a part of the survey plan, Mississippi promised to reserve the sixteenth section "in each township . . . for the support of schools therein."  14 Cong. ch. 62, 3 Stat. 375 (1817).

¶13.    The Court thoroughly described the historical process in *Hill v. Thompson*, 564 So. 2d 1 (Miss. 1989):

> In 1798, Congress created the Mississippi Territory, which included what is now about the southern third of the States of Mississippi and Alabama. 1 Stat. 549. In 1803, Congress provided for the sale and survey of all Mississippi Territory lands to which Indian title had been extinguished but excepted "the section number sixteen, which shall be reserved in each township for the

---

[2]*An ordinance for ascertaining the mode of disposing of lands in the western territory*, 28 Journals of the Continental Congress 375 (May 20, 1785), https://www.loc.gov/resource/llscdam.lljc028/.

support of schools within the same." Stat. 233–234. In 1804, the Mississippi Territory was extended northward to the southern boundary of Tennessee. 2 Stat. 305. Two years later Congress authorized the selection of lands in lieu of unavailable Sixteenth Sections in the Territory. 2 Stat. 401 (1806). Eventually, in 1817, Mississippi was admitted as a State, and a further Land Sales Act provided for the survey and sale of those lands in the northern part of the new State that had not been covered by the 1803 Act. The 1817 Act provided that these lands were to be "surveyed and divided in the manner provided by law for the surveying of the other public lands of the United States in the Mississippi territory;" thus, the Act required that "the section No. 16 in each township . . . shall be reserved for the support of schools therein." 3 Stat. 375 (1817). The Sixteenth Section lands and lands selected in lieu thereof were granted to the State of Mississippi.

*Id.* at 5 (quoting ***Papasan v. Allain***, 478 U.S. 265 (1985)).

¶14.    Mississippi continues to honor the agreement and the "[s]ixteenth section school lands . . . constitute property held in trust for the benefit of the public schools" under the control of the county school board.  Miss. Code Ann. § 29-3-1 (Rev. 2020).  Mississippi's enduring obligation to hold the sixteenth sections for the benefit of public education has come to be known as the sixteenth section trust.  ***N. Bolivar Consol. Sch. Dist. v. Jones***, 359 So. 3d 183, 189 (¶ 21) (Miss. 2023) (citing ***Morrow v. Vinson***, 666 So. 2d 802, 805 (Miss. 1995)).

    II.    *Public Waters Trust*

¶15.    In the act that enabled the people of the Mississippi Territory to form a state,[3] Congress declared that Mississippi would be "on an equal footing with the original states." Entering the union "on equal footing" with the original thirteen states is standard practice

---

[3]*An Act to enable the people of the western part of the Mississippi territory to form a constitution and state government, and for the admission of such state into the union, on an equal footing with the original states*, 14 Cong. ch. 23, 3 Stat. 348 (1817).

when a new state is added[4] and has given rise to the equal footing doctrine. Under the doctrine, any sovereign rights retained by the original thirteen states upon creation of the union are likewise retained by states admitted later. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 203 (1999).

¶16.    One right retained by the original thirteen states was the title to all navigable waters. Courts have consistently used the equal footing doctrine to recognize all states' sovereignty over their navigable waters. *Cinque Bambini P'ship*, 491 So. 2d at 511. "When the original colonies decided to unite to form the United States, each state was granted the right to control its waterways. With each new state's addition to the Union, it was extended this same right under what is known as the Equal Footing Doctrine[.]" *Sec'y of State v. Wiesenberg*, 633 So. 2d 983, 987 (Miss. 1994). The United States Supreme Court explained that the right is grounded in state sovereignty:

> In 1842, the Court declared that for the 13 original States, the people of each State, based on principles of sovereignty, "hold the absolute right to all their navigable waters and the soils under them," subject only to rights surrendered and powers granted by the Constitution to the Federal Government. *Martin v. Lessee of Waddell*, [41 U.S. 367 (1842)]. In a series of 19th-century cases, the Court determined that the same principle applied to States later admitted to the Union, because the States in the Union are coequal sovereigns under the Constitution.

*PPL Montana, LLC v. Montana*, 565 U.S. 576, 590–91 (2012); *see also* *Pollard v. Hagan*, 44 U.S. 212, 212 (1845); *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*,

---

[4]The only exception is Hawaii, which was admitted subject to special restrictions under the Hawaiian Admission Act, Pub. L. 86-3, 73 Stat. 4 (1959).

429 U.S. 363, 372 (1977); *Utah Div. of State Lands v. United States*, 482 U.S. 193, 195 (1987).

¶17.    Our Court reiterated the state's right and obligation to guard its title to navigable water bodies for the public trust in *Ryals v. Pigott*, when it wrote:

> Our federal forebears founded today's law. Under the familiar Equal Footings Doctrine, the sovereign United States conveyed the waters in trust for the people, acceptance by the states being a condition of statehood, and through its law the federal sovereign has identified the waters so conveyed according to the common need.

*Ryals v. Pigott*, 580 So. 2d 1140, 1146–47 (Miss. 1990) (citing *Cinque Bambini P'ship*, 491 So. 2d at 511-12).  The Court stressed that a constitutional imperative undergirds the state's title to navigable waters when it concluded: "[w]aters which are public by virtue of the Constitution and the Equal Footings Doctrine may not—by legislative enactment or judicial decree—be withdrawn from public use."  *Id.* at 1149 (citation omitted); *see also Ill. Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 453 (1892) ("The state can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them . . . than it can abdicate its police powers in the administration of government and the preservation of the peace.").

¶18.    The Court has held that Mississippi can only convey rights in waters and their beds in the public waters trust when the conveyance will not interfere with the purpose of the trust. "[T]he State may dispose of submerged lands under tidal waters to the extent that such disposition will not interfere with the public's right of navigation, swimming and like uses."

8

*Treuting v. Bridge & Park Comm'n of Biloxi*, 199 So. 2d 627, 632–33 (Miss. 1967). "[O]nce held by the state in trust, properties are committed to the public purpose and may be alienated from the state only upon the authority of legislative enactment and then only consistent with the public purposes of the trust." *Cinque Bambini P'ship*, 491 So. 2d at 519 (citing *State v. Hanson Props., Inc.*, 371 So. 2d 871, 873 (Miss. 1979)). "Neither the state nor the federal government can validly convey title in fee simple to [marshlands along the Wolf River] to private owners for private purposes." *Int'l Paper Co. of Moss Point v. Miss. State Highway Dep't*, 271 So. 2d 395, 398 (Miss. 1972) (quoting *Rouse v. Saucier's Heirs*, 166 Miss. 704, 146 So. 291, 292 (1933)).

¶19.    The initial purposes of the trust were specifically delineated by the Court. "The state holds title to lands under the tidal navigable water in trust for the people, for the purposes of navigation, fishing, bathing and similar uses." *Treuting*, 199 So. 2d at 632. The Court has, however, expanded the allowable purposes:

> The public purposes to which these lands and waters placed in the public trust may be devoted are not static. Over the years those purposes have come to include navigation and transportation, commerce, fishing, bathing, swimming and other recreational activities, development of mineral resources, environmental protection and preservation, the enhancement of acquatic, avarian and marine life, sea agriculture and no doubt others.

*Cinque Bambini P'ship*, 491 So. 2d at 512 (citations omitted). In public waterbodies, "fishing—whether for food, commerce, sport or recreation—has always been recognized and respected." *Dycus v. Sillers*, 557 So. 2d 486, 498 (Miss. 1990).

### III.    Navigable Waters

9

¶20. The question of what constitutes navigability has vexed the judiciary in America for decades. *See, e.g.*, **Rapanos v. United States**, 547 U.S. 715 (2006). For our purposes today, the Court need not delve into the minutiae of what the outer definitional bounds of navigable waters may be. It has long been held that, at the very least, waters that are navigable in fact qualify as navigable waters for legal purposes.[5] **Ryals**, 580 So. 2d at 1152. Furthermore, the "State's original title to these waters included the navigable as well as the non-navigable parts." **Cinque Bambini P'ship**, 491 So. 2d at 514. The record shows that Mossy Lake is navigable in fact; therefore, Mossy Lake constitutes navigable waters under legal precedent.

*IV.    The Interplay Between the Two Trusts*

¶21. We now turn to the question that will guide us to the answer to today's issue: what happened to waters that were in the public waters trust when the sixteenth section trust was created? "[W]hen Mississippi entered the Union in 1817, title to the tidelands and navigable waters which had been held by the United States prior to statehood was conveyed to Mississippi in trust and became immediately vested, subject to that trust." **Wiesenberg**, 633

---

[5]The Court has, of course, acknowledged that the waters in the public waters trust extend much further.

> Waters that are valuable for fishing and bathing purposes often are not navigable in fact—at least not at the point where the fishing and bathing takes place. The point is that exclusion of non-navigable tidewaters from the trust in 1817 would have been inconsistent, if not downright irrational, given then accepted public purposes.

**Cinque Bambini P'ship**, 491 So. 2d at 515. Today's opinion should not be construed to limit the Court's previous definitions in any way.

10

So. 2d at 987 (citing ***Corvallis Sand & Gravel Co.***, 429 U.S. at 363). At the inception of the state, Mississippi held in trust for the public, title to the navigable waters. "[E]ffective upon statehood all tidelands and navigable waters were granted to the State in trust." ***Cinque Bambini P'ship***, 491 So. 2d at 519.

¶22. The sixteenth section land vested in the state at the time the survey numbering the sections was complete. ***Cooper v. Roberts***, 59 U.S. 173, 179 (1855) ("But when the political authorities have [surveyed the township] . . . the title of the State becomes a legal title."); ***United States v. Morrison***, 240 U.S. 192, 204 (1916); ***Wisconsin v. Lane***, 245 U.S. 427, 434 (1918). Title logically vests at the time of survey, since only then can the sixteenth section be identified. Prior to a survey, no one knows where a sixteenth section lies.

¶23. When surveyors survey the country into townships, they draw meander lines along the edge of bodies of water. Bureau of Land Management, *Manual of Surveying Instructions* (2009).[6] The bounded waters were not considered part of the section land that was originally sold off by the government.

> It has been the practice of the government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted, no charge being made for the lands under the bed of the stream, or other body of water. The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to

---

[6]https://www.blm.gov/sites/default/files/Manual_Of_Surveying_Instructions_2009.pdf; *see also* Bureau of Land Management, *Instructions to the Surveyors General of Public Lands of the United States* (1855), https://www.az.blm.gov/surveys/Library/1855_Manual.pdf.

such meander lines. It has frequently been held, both by the federal and state courts, that such meander lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered, and that the waters themselves constitute the real boundary.

*Hardin v. Jordan*, 140 U.S. 371, 380 (1891) (citations omitted). When the land was surveyed, and the United States government sold it, the waters were not part of the section sold.

*V.      The Case Sub Judice*

¶24.    The ultimate determination before the Court today requires determining the status of Mossy Lake vis-à-vis the sixteenth section land upon which a fraction of the lake rests. Mossy Lake is a large body of water that, today, spans an arc crossing through parts of sections 4, 3, 10, 15, and 16 of Township No. 17, Range No. 2 West, near Swiftown, Mississippi. The township was initially surveyed in 1832 by Angus McPhail and registered in the surveyor's office in Jackson, Mississippi, in 1835. At the time of the original survey, Mossy Lake was called Cypress Lake and formed a sideways U-shape that crossed through parts of sections 5, 4, 3, 10, 16, 17, 8, and 7 of the township.

¶25.    Evidence in the record shows that Mossy Lake supports boating activities. The School District alleged in its complaint that Dew was in the water "with a boat[.]" Dew argues that he may use Mossy Lake for boating purposes. Because the lake is at least 196 acres, is more than one mile long, and evidence in the record from both parties demonstrates boating occurs on the lake, sufficient evidence in the record indicates that Mossy Lake is navigable in fact, and, therefore, qualifies as navigable waters under the historical definition.

12

¶26. Additionally, it is undisputed that Mossy Lake is an oxbow lake, formed before the founding of our state, when a river altered its course and created a cutoff channel now known as an oxbow. When public waters change course, they do not lose their public nature. *Dycus*, 557 So. 2d at 500 ("[T]he public right to waters formed by an avulsion is as great as any other public waters."). The Court has held that "[e]ach person who can without trespass reach the waters of an oxbow lake may of right fish there to his heart's content, subject only to a like use by others, and reasonable regulation by the state." *Dycus*, 557 So. 2d at 500–01 (citing *State Game & Fish Comm'n v. Louis Fritz Co.*, 193 So. 9, 11 (Miss. 1940)). In *Dycus*, the Court held that all oxbow lakes were in the public waters trust. *Id*.

¶27. Furthermore, Court precedent clearly provides that because water in "its ordinary or natural state . . . is neither land, nor tenement, nor susceptible of absolute ownership" but "is a movable, wandering thing . . . of a transient, usufructuary property[,]" a littoral landowner who may legally access a part of a public lake, may access the whole of that lake. *Louis Fritz Co.*, 193 So. at 11 (citing 67 C.J. 675). The Court continued:

> Inasmuch as there is no private ownership in the water or in the fish, it follows that where, as here, there are several riparian owners of an inland lake, each owner, their licensees, and every other inhabitant who can gain access thereto without trespass, may use the surface of the whole lake for boating and fishing so far and so long as they do not interfere with the reasonable like use by others similarly entitled to that right.

*Id.* The law makes clear that a littoral owner is entitled to access the entirety of the public lake upon which his property fronts.

¶28. Because Mossy Lake was a navigable waterway at the inception of Mississippi, it is

13

part of the public waters trust of the state. Dew asks the Court to determine which trust is superior—sixteenth section trust or public waters trust. However, such a determination is unnecessary because Mossy Lake never accrued to the sixteenth section land in the first place. There is no conflict between the trusts because the land in the sixteenth section "held in trust for the benefit of the public schools" does not and has never included water bodies in the public waters trust. § 29-3-1.

¶29. Mossy Lake is a water body within the public waters trust, and there has been no "legislative enactment . . . consistent with the public purposes of the trust" transferring the lake to the School District. *Cinque Bambini P'ship*, 491 So. 2d at 519. Therefore, the judgment of the Leflore County Chancery Court is reversed, and the case is remanded for further proceedings consistent with the opinion.

¶30. **REVERSED AND REMANDED.**

**RANDOLPH, C.J., KING, P.J., MAXWELL, CHAMBERLIN, ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**