# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-00585-SCT

*LAWRENCE S. STEWART*

*v.*

*H. JAMES HOOVER,*

*SANDRA G. HOOVER*

*AND THE STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 3/7/2001 |
| TRIAL JUDGE: | HON. GLENN BARLOW |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | BRILEY RICHMOND |
| ATTORNEYS FOR APPELLEES: | FREDRICK B. FEENEY |
| | OFFICE OF THE ATTORNEY GENERAL |
| | BY: NANCY MORSE PARKES |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 04/18/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/23/2002 |

**BEFORE McRAE, P.J., AND WALLER AND GRAVES, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1. Lawrence S. Stewart and H. James Hoover and Sandra G. Hoover are owners of adjacent property located in Jackson County, Mississippi. Stewart filed suit in Jackson County Chancery Court alleging that a pier constructed by the Hoovers extended onto his property thereby hindering the enjoyment of his property, causing damage to the vegetation, and adversely affecting the rate and intensity of water flow onto his property. The State of Mississippi intervened in the action via the Secretary of State asserting that at least part of the property subject to this lawsuit was Public Trust Tidelands of which ownership was vested in the State. Stewart then amended his complaint to include the State as a defendant. His contention against the State's assertion of ownership was that since the map of Public Trust Tidelands did not contain the property in question it was not subject to the Trust. Both the Hoovers and the State moved for summary

judgment. The Chancellor granted the motion stating that the subject property was titled to the State and was, therefore, not subject to private ownership. Stewart then tendered his appeal to this Court asserting the following issues:

**I. WHETHER THE STATE IS PRECLUDED FROM CLAIMING OWNERSHIP OF THE LAND SINCE IT WAS NOT SHOWN TO BE PUBLIC TRUST TIDELANDS ON A TIDELANDS MAP PREPARED BY THE SECRETARY OF STATE AND FILED WITH THE CLERK OF THE JACKSON COUNTY CHANCERY COURT.**

**II. WHETHER STEWART'S RIPARIAN RIGHTS WERE VIOLATED BY THE ACTIONS OF THE SECRETARY OF STATE AND THE HOOVERS.**

## FACTS AND PROCEDURAL HISTORY

¶2. Stewart and the Hoovers are owners of adjacent property situated on Heron Bayou in Ocean Springs, Jackson County, Mississippi. On May 26, 1992, Hoover was granted permits by the Mississippi Department of Wildlife Conservation, Bureau of Marine Resources, and the Mississippi Department of Wildlife, Fisheries and Parks to construct a T-shaped pier extending 110 feet across marshland to Heron Bayou with the top of the "T" portion being 24 feet long. As constructed, the pier extended beyond the call of the Hoovers' deed and onto property the ownership of which is asserted by Stewart. Subsequent to the pier's construction in 1992, on December 14, 1995, Margaret Anne Bretz, a senior attorney with the Secretary of State's Office, wrote Stewart outlining the results of a visual inspection conducted by Bretz and Daryl Thomas of the Department of Marine Resources. Bretz and Thomas opined that "any portion of the Hoover pier which is not located on Mr. Hoover's property extends over tidally affected wetlands which are below the line of mean high tide, and therefore are public trust tidelands."

¶3. Stewart commenced suit against the Hoovers on September 16, 1999, seeking injunctive relief for removal of the pier from the property and restoration of the property to its condition prior to the pier's construction. Stewart also sought damages for trespass and disturbance of his right to peacefully enjoy the property, for damage to vegetation, and for change of the course and flow of the natural drainage of the property. In October of 1999, Hoover requested the Department of Marine Resources to conduct a Tidelands Determination. Stephan Oivanki, Coastal Ecology Director of the Department of Marine Resources, concluded that the "tidal wetlands crossed by your pier are state tidelands, subject to the ebb and flow of the tide below mean high tide level, and as such are the property of the State of Mississippi."

¶4. The State filed its Motion to Intervene and Intervenor's Claim to Title to Certain Tidelands Property on December 23, 1999, and was allowed to intervene as a defendant in this action on March 2, 2000. The bases for the State's Motion to Intervene were that part of the subject property was Public Trust Tidelands the ownership of which was vested in the State and that disposition of the case without the State as a party would impair or impede the ability of the State to protect its ownership interest. In the Order Allowing Intervention, the Secretary of State was required to determine if Stewart was in violation of the Public Trust Tidelands Act. The Secretary was ordered to notify Stewart pursuant to Miss. Code Ann. § 29-15-7 (2000) of his determination of whether Stewart was in violation of the Act. Such notification was attempted by mail three times but was returned as unclaimed.

¶5. Stewart amended his complaint to include the State in seeking declaratory relief and also that the State had no interest in the land because it was not designated as Public Trust Tidelands on the preliminary map

or on the final certified map on record in the Jackson County Chancery Court. Thereafter, both the Hoovers and the State moved for summary judgment. Chancellor Barlow granted both motions and stated that "The area in question clearly falls within the scope and meaning of the cases which leads to the only conclusion that can be reached, that is, this property is not subject to private ownership." From this adverse ruling, Stewart appealed to this Court.

## STANDARD OF REVIEW

¶6. This Court employs the de novo standard in reviewing a trial court's grant of summary judgment. *O'Neal Steel, Inc. v. Millette*, 797 So. 2d 869, 872 (Miss. 2001). In conducting the de novo review, we look at all evidentiary matters before us, including admissions in pleadings, answers to interrogatories, depositions, and affidavits. *Lee v. Golden Triangle Planning & Dev. Dist., Inc.*, 797 So. 2d 845, 847 (Miss. 2001) (citing *Aetna Cas. & Sur. Co. v. Berry*, 699 So. 2d 56, 70 (Miss. 1996)). This evidence must be viewed in the light most favorable to the party against whom the motion for summary judgment has been made. *Leslie v. City of Biloxi*, 758 So. 2d 430, 431 (Miss. 2000).

## DISCUSSION

### I. WAS THE STATE OF MISSISSIPPI PRECLUDED FROM CLAIMING OWNERSHIP OF THE LAND SINCE IT WAS NOT SHOWN TO BE PUBLIC TRUST TIDELANDS ON A TIDELANDS MAP PREPARED BY THE SECRETARY OF STATE AND FILED WITH THE CLERK OF THE JACKSON COUNTY CHANCERY COURT?

¶7. It is a well-established principle of law that lands covered by tide waters within a state belong to the state in which they are found. *Illinois Cent. R.R. v. Illinois*, 146 U.S. 387, 435, 13 S. Ct. 110, 36 L. Ed. 1018 (1892). Titles to such lands were granted to Mississippi in trust upon its admission to the Union in 1817 under the equal footing doctrine and included in what is known as the "public trust." *Cinque Bambini Partnership v. State*, 491 So. 2d 508, 511 (Miss. 1986), *aff'd sub nom. Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 108 S. Ct. 791, 98 L. Ed. 2d 877 (1988). Also included in the public trust are sixteenth section school lands. *Id.* (citing *Turney v. Marion County Bd. of Educ.*, 481 So. 2d 770 (Miss. 1985). Fee simple title to property held in trust cannot be disposed of except if pursuant to a "higher public purpose" that is not detrimental to the general public. *Secretary of State v. Wiesenberg*, 633 So. 2d 983, 987 (Miss. 1994). Such a disposition can be accomplished "only upon the authority of legislative enactment and then only consistent with the public purposes of the trust." *Cinque Bambini*, 491 So. 2d at 519. Furthermore, title to tidelands cannot be lost via adverse possession, limitations, or by laches and "[u]nder no circumstances may title held by the State for the public use or benefit be so lost." *Id.* at 521 (citations omitted).[(1)]

¶8. The extent of the public trust was further defined in *Cinque Bambini Partnership v. State*. 491 So. 2d 508 (Miss. 1986). The Court stated that the State held fee simple title to "all lands naturally subject to tidal influence, inland to today's mean high water mark . . . ." *Id.* at 510-11. This Court recognized the ambulatory nature of the public trust in that it could be augmented by accretions and also by the naturally occurring inland expansion of tidal influence. *Id.* at 519. A private owner, on the other hand, could always lose title to his lands through reliction as well as gain land by accretion. *Id.* (citing *Anderson-Tully Co. v. Tingle*, 166 F.2d 244 (5th Cir. 1948)). The holding served to conclusively establish that "all lands subject to the ebb and flow of the tide and up to the then mean high water level, without regard to navigability[,]" were granted to the State in 1817. *Id.* at 514.

¶9. The relationship between the State and that of a landowner is that of a "mere titleholder vis-a-vis adjoining or contiguous landowners." *Id.* at 519. Given the ambulatory nature of the public trust boundary line and this relationship, much discord arose as to the location of an actual property line.

¶10. In response to this discord, the Legislature enacted the Public Trust Tidelands Act in 1989. Miss. Code Ann. § 29-15-1 *et seq.* (2000). The purpose of the legislation was to "resolve the uncertainty and disputes which have arisen as to the location of the boundary between the state's public trust tidelands and the upland property and to confirm the mean high water boundary as determined by the Mississippi Supreme Court, the laws of this state and this chapter." Miss. Code Ann. § 29-15-3(2). The Legislature declared that such a resolution was a "higher public purpose" of the State and the public tidelands. *Id.*

¶11. Under the Act, the Secretary of State was to prepare a Preliminary Map of Public Trust Tidelands depicting the boundary "as the current mean high water line where shoreline is undeveloped and in developed areas or where there have been encroachments, such maps shall depict the boundary as the determinable mean high water line nearest the effective date of the Coastal Wetlands Protection Act[2]". Miss. Code Ann. § 29-15-7(1). The statute recognized that natural inland expansion of tidelands increased the lands subject to the trust and that natural reliction diminished the amount of land subject to the trust in favor of the contiguous upland owner. Miss. Code Ann. § 29-15-7(2). Common law rights pertaining to tidelands such as riparian and littoral rights were likewise recognized. *Id.*

¶12. After completion of the preliminary map, it was to be posted in the clerks' offices of the chancery courts of Mississippi's three coastal counties.[3] Miss. Code Ann. § 29-15-7(3). A notice announcing that the preliminary map was subject to public inspection was to be posted in newspapers and posted in three public places in each coastal county. *Id.* The Secretary was to allow sixty days after publication for public comment and revisions to the map. Miss. Code Ann. § 29-15-7(4). Within twenty days, the Secretary was to incorporate any revisions to the preliminary map and certify its final adoption. *Id.* Of particular importance to the instant case, the statute provides that

> Upon recordation, the certified map shall be final to those properties not subject to the trust. The Secretary of State shall issue to all consenting property owners a certificate stating that the described property does not lie within the boundary of the public trust and is not subject to the trust.

*Id.* Within 120 days of the certified map's final adoption, the Secretary was to determine which property owners were subject to and in violation of the trust and notify such owners that the boundary would become final in three years unless a contrary claim was submitted. *Id.*

¶13. If a dispute between the State and a property owner could not be resolved within six months, either party could apply to the chancery court of the county embracing such property. Miss. Code Ann. § 29-15-7(5). In any action, the State was to bear the burden of proof by a preponderance of the evidence standard that the disputed land was subject to the trust. *Id.* If no action was taken within three years after receipt of notice by the occupant, the boundary as it was set in the certified map became final. Miss. Code Ann. § 29-15-7(6). Stewart's land was never classified as being subject to the trust on the preliminary and final certified map nor did he ever receive notice from the Secretary of State that his land was subject to the trust. According to Stewart, the Secretary should be bound by the map that he himself had created.

¶14. The constitutionality of the Tidelands Act was attacked in *Secretary of State v. Wiesenberg*. 633

So. 2d 983 (Miss. 1994). William Byrd, the owner of a Honda dealership south of Highway 90 bordering the Mississippi Sound, brought suit to confirm his title so that he could sell his business. *Id.* at 986. Secretary of State Dick Molpus intervened seeking to have the Tidelands Act declared unconstitutional. *Id.* Byrd then amended his complaint to include a determination of the Act's constitutionality. *Id.* On this issue, we held that the Tidelands Act was constitutional and affirmed the use of July 1, 1973, the effective date of the Coastal Wetlands Protection Act, as the starting point for determination of the mean high tide line in developed areas. *Id.* We made clear that the use of the 1973 point continued to be subject to state common law regarding tidelands, submerged lands, and riparian and littoral lands. *Id.*

¶15. We acknowledged that the intent of the Tidelands Act was to "finally put to rest the confusion and chaos surrounding Mississippi's shoreline property." *Id.* at 990. The Secretary of State argued that the legislation would effect a donative transfer of public trust property at the expense of the people in violation of Article 4, Section 95 of the Mississippi Constitution.[4] *Id.* However, the legislation was found to comport with section 95 and, therefore, did not serve as an impermissible donation. *Id.* at 991. Rather, it was a "unified attempt by the Legislature to resolve the discord existing between the State and area landowners." The Act may not have passed constitutional muster had it not been for the amount of discretion vested in the Secretary of State in finalizing the map. *Id.* The Legislature enacted a reasonable and constitutionally permissible statute and vested responsibility of protecting the public trust with a constitutional office, namely, the Secretary of State. *Id.*

¶16. We conceded that basing the mean high water line as of 1973 was not a perfect solution, but the Act as applied would produce a tidelands map that would protect the public's interest as well as private ownership. *Id.* The Secretary of State must hold any incidental or accidental public trust land losses to a minimum. *Id.* We interpreted the use of July 1, 1973, as the *starting point* in determining the mean high water line in *developed* areas. *Id.*

¶17. In the instant case, Stewart contends that the State is precluded from asserting ownership of the contested property because such property was not included in the Preliminary Map of Public Trust Tidelands nor in the final certified map. We are of the opinion that the Legislature's goal of establishing certain and stable land titles does not contemplate a loss of public trust lands because of an oversight in the mapping process. The subject property, admitted by Stewart's counsel to be in its natural state and found by the chancellor to be subject to the trust, will be classified as public trust tidelands in future mappings of the Heron Bayou region. As was mentioned earlier, title to tidelands cannot be lost through adverse possession, limitations or by laches. Whatever the reason for not including the subject property on the preliminary map or final certified map, the delay of the State in asserting its ownership interest should not be preclusive because such interest was not expressed in the maps.

¶18. This conclusion is buttressed by *City of Newark v. Natural Resource Council*. 336 A.2d 46 (N.J. Super. Ct. Law Div. 1974), *aff'd* 372 A.2d 644 (N.J. Super. Ct. App. Div. 1977). Though of course not binding, the opinion's holding is nonetheless persuasive. The City of Newark, New Jersey, sought a review of maps that were published by the Natural Resource Council indicating which lands the State claimed ownership and those which it did not claim ownership. *Id.* at 48. New Jersey's statute, comparable to our Public Trust Tidelands Act, stated that "Upon completion of each separate study and survey, the council shall publish a map portraying the results of its study and clearly indicating those lands designated by the council as State-owned lands." *Id.* at 49. (quoting N.J. Stat. Ann. § 13:1B-13.4 (West 2002)). Recognizing the perplexing problem of tidelands ownership, the court held that the New Jersey statutory scheme did not

divest the state of its interest but merely required that the state define its interest in unequivocal terms. *Id.* at 54. We believe that this same conclusion is warranted in the instant case.

## II. WERE STEWART'S RIPARIAN RIGHTS VIOLATED BY THE ACTIONS OF THE SECRETARY OF STATE AND THE HOOVERS?

¶19. Stewart asserts that the Hoovers' construction of the pier and the State's assertion of ownership of the subject property violated his riparian rights. However, he is in error in asserting that riparian rights have been violated. "Riparian" is defined as

> Belonging or relating to the bank of a river or stream; of or on the bank. Land lying beyond the natural watershed of a stream is not "riparian."

> The term is sometimes used as relating to the shore of the sea or *other tidal water*, or of a lake or other considerable body of water not having the character of a watercourse. *But this is not accurate*. The proper word to be employed in such connections is "*littoral*."

Black's Law Dictionary 1327 (6th ed. 1990)(emphasis added). "Littoral rights" are those "[r]ights concerning properties abutting an ocean, sea or lake rather than a river or stream (riparian). Littoral rights are usually concerned with the use and enjoyment of the shore." *Watts v. Lawrence*, 703 So. 2d 236, 238 (Miss. 1997) (quoting Black's Law Dictionary 934). The rights at issue in this case are littoral rights.

¶20. In *Watts*, the plaintiff, Watts, was an adjoining landowner of the defendants, the Lawrences. 703 So. 2d at 236. The Lawrences constructed a pier and planned to construct a boathouse at the end of it. *Id.* at 237. The Bureau of Marine Resources, the state agency responsible for wetlands regulation, granted the Lawrences a permit to construct the boathouse. *Id.* Watts had no problem with the pier but argued that the boathouse should not be constructed because the Lawrences had no littoral rights. *Id.*

¶21. We held that littoral rights are not property rights *per se*, but are merely licenses or privileges. *Id.* at 238 (citing *Mississippi State Highway Comm'n v. Gilich*, 609 So. 2d 367, 375 (Miss. 1992)). Once the Lawrences had established their littoral rights by obtaining their permit, authority was vested by the Legislature in the Bureau of Marine Resources to administrate all activity associated with those rights. *Id.* at 238. We expressly stated that "the construction of the boathouse by the Lawrences was subject only to regulation by BMR. The Lawrences received a permit to build their boathouse in accordance to certain specifications and adhered to it." *Id.* Such being the case, we affirmed the chancellor's finding that the Lawrences had littoral rights. *Id.*

¶22. Since we are of the opinion that the subject property in this case which is beyond the calls of the Hoovers' deed is public trust tidelands, their property abutted public property. Just like in *Watts*, the Hoovers obtained the requisite permits from the Bureau of Marine Resources, therefore, the Hoovers, and not Stewart, have littoral rights to the subject property.

## CONCLUSION

¶23. We hold that the property which is the subject of this dispute is public trust tidelands, the ownership of which is vested in the State of Mississippi. The Chancellor did not err in concluding that the State was not precluded from asserting ownership of such lands. We further affirm the learned Chancellor and hold that Stewart's riparian claim is without merit. The judgment of the chancery court is affirmed.

**¶24. AFFIRMED.**

**PITTMAN, C.J., SMITH, P.J., COBB, DIAZ, CARLSON AND GRAVES, JJ., CONCUR. McRAE, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**

1. *See* John A. Duff & Kristen M. Fletcher, *Augmenting the Public Trust: The Secretary of State's Efforts to Create a Public Trust Ecosystem Regime in Mississippi*, 67 Miss. L.J. 645 (1998); M. Casey Jarman, *Of Time, Tidelands, and Public Trust*, 57 Miss. L.J. 131 (1987); Peter L. Doran, Note, *Mississippi Tidelands Ownership-Are There Clouds on the Horizon?*, 8 Miss. C.L. Rev. (1987) for a general history of the Public Trust Doctrine and its application in Mississippi.

2. *See* Miss. Code Ann. §§ 49-27-1 *et seq.* (2000). The Coastal Wetlands Protection Act became effective in 1973 and charged the Mississippi Marine Resources Council with preparing the maps outlining the state-owned wetlands. ***Cinque Bambini***, 491 So. 2d at 511.

3. Mississippi's three coastal counties are Hancock County, Harrison County, and Jackson County.

4. Article 4, § 95 of the Mississippi Constitution states:

> Lands belonging to, or under the control of the state, shall never be donated directly or indirectly, to private corporations or individuals, or to railroad companies. Nor shall such land be sold to corporations or associations for a less price than that for which it is subject to sale to individuals. This, however, shall not prevent the legislature from granting a right of way, not exceeding one hundred feet in width, as a mere easement, to railroads across state land, and the legislature shall never dispose of the land covered by said right of way so long as such easement exists.

Miss. Const. art. 4, § 95.